**In re ARGUS GROUP 1700, INC., Debtor.**

**In re ARDEN PHOENIX GROUP 1700, L.P., Debtor.**

**Milton STEINMAN, Plaintiff,**

**v.**

**Craig A. SPENCER, Robert S. Spencer, Arden Phoenix Group 1700, L.P., the Arden Group, Inc. and Argus Group 1700, Inc., Defendants.**

**Bankruptcy Nos. 96–14368DWS, 96–14369DWS.**

**Adv. No. 96–1016.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 31, 1996.

## MEMORANDUM OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the motion for remand ("Remand Motion") filed by plaintiff Milton Steinman ("Steinman") in the above-captioned adversary proceeding. Steinman originally filed the litigation (the "Steinman Litigation") which is the subject of this adversary proceeding in the Court of Common Pleas of Philadelphia ("State Court"). However, upon filing for bankruptcy, Debtors removed the litigation to the District Court for the Eastern District of Pennsylvania (the "District Court") which referred it here.[1]

A hearing (the "Hearing") was held at which the parties presented oral argument regarding their respective positions on the Remand Motion.[2] At the Hearing, we also addressed the status of the Debtors' bankruptcy case[3] and specifically whether it advanced any legitimate bankruptcy purpose.[4] On this latter issue, Debtors presented both testimony and documentary evidence. Having considered the record and the parties' briefs, the Court concludes that the Steinman Litigation should be remanded to the State Court, and based on the circumstances present, that the bankruptcy case should be dismissed.

---

1. Steinman filed his motion for remand while this removed matter was still pending in the district court. When the district court referred the matter here, Steinman filed an "Application for Resolution of the Pending Motion for Remand Referred to this Court by the District Court," incorporating therein the motion for remand which he filed in district court. We are referring to the aforementioned application as Steinman's "Remand Motion."

2. Although provided the opportunity, none of the parties presented any testimony in support of their respective positions on the Remand Motion.

3. By Order entered July 2, 1996, the Debtors' bankruptcy cases were administratively and substantively consolidated.

4. By Order dated August 6, 1996, the parties were notified that the Hearing would address this subject. At the Hearing, counsel was advised that while no party had filed a motion to dismiss, the Court has authority to *sua sponte* dismiss a bankruptcy case. However, I stressed that it would not be the Court's usual practice to dismiss a case based upon a status conference. Rather if the circumstances gleaned during the status conference did not assuage the Court's concerns, a rule to show cause why the case should not be dismissed would be issued and a hearing scheduled thereon. Acknowledging his understanding of this situation, Debtors' counsel represented to the Court that Debtors were not only willing to proceed to demonstrate why the case should not be dismissed without the issuance of a rule to show cause, but desired to do so. *See* Transcript 70–74.

## BACKGROUND

██ Many of the facts relevant to this matter are set forth in this Court's Opinion dated August 6, 1996 in the above-captioned case.[5] For purposes of clarity, certain of them are reiterated here. The other facts listed below are gleaned from the record, as developed at the Hearing, and from documents, as indicated, which Debtors filed in their bankruptcy case.[6]

Arden Phoenix Group 1700, L.P. ("Phoenix") is a Pennsylvania limited partnership which owns the real property located at 1700 Samson Street, Philadelphia and the improvements thereon, consisting of an office building (the real property and improvements are collectively referred to hereinafter as the "Property"). Opinion at 2. Phoenix has approximately six or seven limited partners of which Steinman is one. Transcript at 75. Phoenix's sole general partner is the Argus Group 1700, Inc. ("Argus"); its stock is wholly owned by Craig A. Spencer ("C. Spencer"). Opinion at 2–3.

*THE STEINMAN LITIGATION.* Steinman commenced his litigation in State Court in October of 1995. Opinion at 3. He named as defendants in the action the Debtors, C. Spencer, Robert S. Spencer ("R. Spencer") and Argus Group, Inc. ("Group"). *Id.* R. Spencer acts as a financial consultant to the Debtors; he is also C. Spencer's father. *Id.* Group, which is another corporation wholly owned by C. Spencer, manages the affairs of Phoenix as well as thirteen other real estate projects. *Id.*

Steinman's complaint (the "Complaint"), as amended, is a 53–page pleading. It contains the following eight counts: (I) state law securities violation against C. and R. Spencer (collectively referred to hereinafter as the "Spencers") and Group;[7] (II) fraudulent

misrepresentation and concealment against the Spencers, Group and Argus; (III) negligent misrepresentation against the Spencers, Group and Argus; (IV) breach of fiduciary duty against C. Spencer and Argus; (V) appointment of a receiver v. Phoenix; (VI) disgorgement against Argus and C. Spencer; (VII) accounting v. Phoenix, Group and Argus; and (VIII) breach of limited partnership agreement against C. Spencer, Argus and Phoenix. *Id.* Significantly, the only counts directed against Phoenix are for the appointment of a receiver, for an accounting and for breach of the limited partnership agreement. The gist of the Complaint is revealed by its introductory paragraph which states:

> Plaintiff Milton Stein demands compensatory and punitive damages and equitable relief arising from Defendants' fraudulently inducing his investment in Defendants' real estate limited partnership, and then secretly siphoning off hundreds of thousands of dollars from this limited partnership to themselves and their alter ego entities through, *inter alia,* hundreds of thousands of dollars in concealed fees paid to Defendants; mortgages in violation of the limited partnership agreement upon the limited partnership's property; misrepresentations, material omissions and distributions made from borrowed funds fraudulently intended to lull Plaintiff into maintaining his investment in the partnership scheme; the concealment [of R. Spencer's criminal conviction] and funding of [Ponzi schemes]....

Opinion at 4 (quoting from Complaint at 1–2).

██ All of the defendants filed preliminary objections to the Complaint which were denied. Transcript at 16. While the preliminary objections were pending, the State Court set a discovery deadline for the litigation of September 2, 1996 and a trial ready

---

5. Judicial notice is taken of the facts set forth in the August 6, 1996 Opinion. *See* Fed.R.Evid. 201. *See also Scott v. Angelone,* 771 F.Supp. 1064, 1068 (D.Nev.1991) (court may take judicial notice of its own opinions, published or not), *aff'd,* 980 F.2d 738 (9th Cir.1992); *Sommers v. Sorce (In re Major Funding Corporation),* 126 B.R. 504, 508 (Bankr.S.D.Tex.1990) (taking judicial notice of facts set forth in court's opinion in another adversary proceeding in same bankruptcy case).

6. The parties agreed that the Court could consider Debtors' Schedules and Monthly Operating Reports as part of the record. *See* Transcript from Hearing on September 9, 1996 (hereinafter referred to as "Transcript") at 112–113.

7. While the caption suggests that Count I is also directed at Argus, the allegations and prayer for relief state otherwise. Opinion at 3 n. 3.

date of January, 1997, which Steinman's counsel explained without disagreement from Debtors' counsel, generally means that the case will go to trial within 120 days thereafter. Transcript at 15–18, 23; Exhibit "B" to Steinman's Motion. However, even before this scheduling order was entered, the parties had begun conducting discovery. *See* State Court's Order dated February 2, 1996. During the period in which this litigation was in State Court, thirteen depositions were taken, Transcript at 16, 29; all but one of these depositions were noticed by Steinman, *id.* at 29. Document requests were also served. *Id.* at 21, 28–29. After the State Court denied the defendants' preliminary objections, the non-debtor defendants filed an answer to the Complaint. *Id.* at 18, 20. However, Debtors filed their bankruptcy cases on May 10, 1996 before their answers to the Complaint were due.[8] *Id.*

The parties' discovery in State Court generated hotly contested disputes between them. Opinion at 4. As a result of one of these disputes, the State Court entered a sanctions order ("Sanctions Order"), dated February 21, 1996, compelling the non-debtor defendants, namely, the Spencers and Group, to produce documents within seven days or pay Steinman the sum of $1,000 per day for each day its order is violated. *Id.* The Sanctions Order also set a hearing for March 13, 1996 for the defendants to show cause why they and their counsel should not be held in contempt for willful violations of the court's prior orders and why a receiver should not be appointed to manage Phoenix and an independent counsel appointed to protect the limited partnership interests in the litigation. *Id.* In addition, the Sanctions Order required defendants and their counsel to pay $1,000 to Steinman within five days

for fees and costs incurred in filing his motion.

Defendants appealed the Sanctions Order to the Pennsylvania Superior Court and, on March 13, 1996, were granted a stay pending appeal. Opinion at 4. Steinman subsequently filed a motion to quash the appeal, contending the Sanctions Order was interlocutory. *Id.* By order dated May 7, 1996, the Superior Court granted Steinman's motion, vacated its order entering the stay and remanded the matter to the State Court to award Steinman his counsel fees and costs. *Id.* Three days after the Superior Court entered this order, Phoenix and Argus filed voluntary petitions under Chapter 11 of the Bankruptcy Code, thereby obtaining the benefit of the automatic stay to prevent the Steinman Litigation from continuing in State Court. *Id.*

When questioned at the Hearing regarding the amount of time needed to complete discovery before proceeding to trial in the Steinman Litigation, the parties agreed that a ninety day period would be sufficient.[9] Transcript at 31–33. They also agreed to move forward in this Court with such discovery, concluding that regardless of whether the litigation ultimately remained in this Court, it made sense not to delay such discovery further. *Id.* at 58–65.

During the discovery dispute that led to the Sanctions Order, defendants apparently became convinced that they could not receive a fair hearing in State Court. Opinion at 5. As a result, on March 7, 1996, Phoenix filed suit (the "Federal Action") in federal court under the Civil Rights Act, 42 U.S.C. § 1983, against Steinman and various John Doe defendants identified as the employees on staff of the State Court Judge Eugene Maier and

---

8. According to the docket in this matter, of which judicial notice is taken pursuant to Fed. R.Evid. 201 and Fed.R.Bankr.P. 9017, Debtors proceeded to file an answer to the Complaint on September 10, 1996. *See Maritime Electric Company, Inc. v. United Jersey Bank,* 959 F.2d 1194, 1200 n. 3 (3d Cir.1992) (taking judicial notice of docket entries in bankruptcy court); *Levine v. Egidi,* 1993 WL 69146 at *2 (N.D.Ill.1993) (bankruptcy judge may take judicial notice of his or her own docket); *In re Paolino,* 1991 WL 284107 at *12 (Bankr.E.D.Pa.1991) ("courts may take

judicial notice of the contents of their own dockets.").

9. Counsel for the non-debtor defendants qualified his joinder in this agreement by stating that in projecting that discovery could be completed in ninety days, he was assuming that the litigation would proceed in this Court—if the litigation were to be remanded to the State Court, he believed the discovery could take much longer if there were disputes requiring judicial resolution. Transcript at 31–33.

the State Court "who wilfully acted to deprive plaintiff of his [*sic*] federal rights by actively assisting defendant to gain undue influence over Judge Maier to the detriment of Plaintiff." *Id.* Subsequent to the filing of Debtors' bankruptcy cases, the District Court also referred the Federal Action to this Court. It was docketed at Adversary No. 96–1096.

*BANKRUPTCY FILING.* According to Debtors' counsel, it was the mounting costs of the litigation being waged by and against Steinman in both state and federal court that drove Debtors to file for bankruptcy, and it is this same litigation that is the crux of their bankruptcy case. Opinion at 2, 11–12. At the Hearing, C. Spencer, testifying on behalf of the Debtors, reiterated this viewpoint regarding Debtors' motivation in filing for bankruptcy. *See* Transcript at 85–86.

C. Spencer also confirmed that when Debtors filed for bankruptcy, Phoenix, which is the operating entity, did not have creditor problems. It was current on its obligation to its mortgagee Carnegie Bank, *see id.* at 78, and was operating on a "better than break even basis," *id.* at 88. Phoenix's Schedules reflect as much. The Schedules list the current market value of the Samson Street property as $2,000,000.00 and Phoenix's obligation to Carnegie Bank as $1,237,940.38. *See* Schedule A. The only other debts listed on the Schedules are $12,000 in unsecured priority claims owed to the City of Philadel-

phia for real estate taxes and unsecured nonpriority claims totaling $127,785.68. *See* Schedules E & F. The vast majority of these unsecured nonpriority claims belong to Spector, Gadon & Rosen, P.C. (the "Rosen Firm") which is the law firm that was defending both Debtors and the non-debtor defendants against the Steinman Litigation in State Court.[10] Excluding the amount of the Rosen Firm's claim, which is listed as $112,618.35, the remainder of the unsecured debt totals only $15,167.33. Argus' Schedules reflect the same information, except that Argus is not listed as owning any real property and its obligation to Carnegie Bank is listed as an unsecured nonpriority claim. *See* Schedules A & F.

According to C. Spencer, before Phoenix filed for bankruptcy, its monthly net income was approximately $2,000 to $3,000. Transcript at 88–89. A review of Phoenix's Monthly Operating Reports filed to date indicate that, but for Phoenix's "reorganization expenses," its monthly net income would still be approximately the same or even higher.[11]

*STEINMAN'S MOTION FOR TRUSTEE AND PROOFS OF CLAIM.* Approximately one month after Debtors filed for bankruptcy, on June 13, 1996, Steinman filed an Application for Appointment of an Independent Trustee against Phoenix ("Motion for a Trustee") based upon allegations of fraud

---

**10.** Debtors' Application to Employ the Rosen Firm as special litigation counsel, which was one subject of the August 6, 1996 Opinion, was denied based on the Court's finding that representation of both the Debtors and non-debtor Defendants was impermissible under 11 U.S.C. § 327(e) which requires a professional to be free of any interest adverse to the debtor or the estate.

**11.** The Income Statement in Phoenix's Monthly Operating Report for the month ending June 30, 1996, shows monthly net income, excluding "Reorganization Expenses" for the period commencing May 11, 1996 through May 31, 1996, of $2,662 (gross profit of $25,175 minus operating expenses of $12,622 and interest expense of $9,960) and for the month of June, 1996, of $2,720 (gross profit of $38,534 minus operating expenses of $12,994 and interest expense of $10,274). The Reorganization Expenses for these periods of time, consisting of professional fees only, are listed as $11,676 and $41,989, respectively.

The Income Statement in Phoenix's Monthly Operating Statement for July, 1996, shows a net income for July of $1,672 (gross profit of $41,570 minus operating expenses of $29,970 and interest expense of $9,928). The Reorganization Expense is listed as $13,489. It consists of $12,898 in professional fees and $500 for the U.S. Trustee Fees.

Similarly, the Income Statement in the Monthly Operating Report for September shows a monthly net income for August of $7,214 (gross profits of $45,314 minus operating expenses of $27,855 and interest expense of $10,245) and for September of $4,104 (gross profits of $43,448 minus operating expenses of $29,116 and interest expense of $10,228). The reorganization expenses for these months are listed as $5,904 (professional fees only) and $13,489 (professional fees of $12,989 and U.S. Trustee Fees of $500), respectively.

The Operating Report for August has not been filed.

and mismanagement.[12] Many of the allegations which form the basis of the Motion for a Trustee were made in the Complaint filed in the Steinman Litigation. While a hearing on the Motion for a Trustee was originally scheduled for July 16, 1996, the hearing was continued without a date with the parties' consent. Discovery related to the allegations contained in the Motion for a Trustee has been on-going.[13] Transcript at 27, 59–64.

Less than ten days later, Steinman filed proofs of claim in each of the Debtors' cases. On June 21, 1996, Steinman filed a Proof of Claim against Phoenix listing the total amount of his claim as $902,275.50. This total is the sum of the following components: (i) $744,250.00 allegedly representing the value of Mr. Steinman's 22.9% partnership interest in Debtor; (ii) $30,025.50 for attorneys' fees and costs allegedly owed pursuant to the Superior Court's Order; and (iii) $128,000 for sanctions awarded by the State Court in its Sanctions Order. On June 26, 1996, Steinman filed an amendment to his Proof of Claim, with the only change being that he attached documentation to support his claim. The next day, June 27th, Phoenix filed an Objection to Steinman's Proof of Claim seeking to have Steinman's claim disallowed in its entirety based on offsets for which Steinman is allegedly liable and raising a counterclaim against Steinman for equitable subordination of his claim pursuant to § 510. *See* Debtor's Objection to Proof of Claim of Milton Steinman with Affirmative Defenses and Request for Equitable Subordination Pursuant to Section 510 of the Bankruptcy Code (attached as Exhibit F to Debtor's Surreply Memorandum in Opposition to Plaintiff Milton Steinman's Motion for Remand).

On July 2, 1996, after Phoenix filed its Objection, Steinman filed another amendment to the original Proof of Claim. In this second amendment, Steinman reduced the total amount of his claim from $902,275.50 to $775,275.50, based upon his apparent acknowledgment that the $1,000 per day monetary sanction was only awarded against the non-debtor defendants and not against Debtors.

Thereafter, on July 12, 1996, Steinman filed yet another amendment to his Proof of Claim. This third amendment deleted from the claim Steinman's demand for $744,250.00, which was the amount he was claiming is owed to him for his 22.9% interest in Phoenix. With the deletion of this portion of Steinman's claim, the total amount of the claim was reduced to $31,025.50.

At the same time Steinman was filing his Proofs of Claim against Phoenix, he was also filing Proofs of Claim against Argus. On June 21, 1996, Steinman filed a Proof of Claim against Argus listing a total due of $158,025.50 allegedly representing: (i) $30,025.50 due to Steinman for attorney's fees and costs pursuant to the Superior Court's Order; and (ii) $128,000 for sanctions awarded by the State Court in its Sanctions Order. On June 26, 1996, Steinman filed his first amendment to his Proof of Claim, with the only change being the addition of documentation to back up his claim. Another amendment to his Proof of Claim was filed on July 2, 1996, reducing the total amount of his claim to $31,025.50. As with the second amended Proof of Claim which Steinman filed against Phoenix, the reduction in the total amount of Steinman's claim reflects his apparent acknowledgment that the monetary sanction awarded against Argus in the Sanctions Order only included that $1,000 lump sum and not the additional $1,000 per day fine that was awarded against the non-debtor defendants. Thereafter, on July 12, 1996, Steinman filed a third amendment to his Proof of Claim. Insofar as the Court can detect, in this amendment, Steinman simply made deletions in his description in boxes

---

12. As noted above, one of the counts asserted against Phoenix in the State Court was for the appointment of a receiver. At the Hearing, Steinman's counsel advised the Court that his client did not have a preference between having a receiver appointed in State Court or having a trustee appointed in Bankruptcy Court. *See* Transcript at 8–9.

13. In early October, Debtors' counsel notified the Court by letter that the discovery had been completed and requested that the Motion for a Trustee be set for hearing. Given our disposition herein, no hearing has been scheduled.

#1 and #2 of the Proof of Claim which request the claimant to identify his "basis for claim" and the "date debt was incurred."

As Phoenix had done, Argus filed an Objection to Steinman's Proof of Claim on June 27, 1996, between the filing of Steinman's first and second amended Proofs of Claim. *See* Debtor's Objection to Proof of Claim of Milton Steinman (attached as Exhibit F to Debtor's Surreply Memorandum in Opposition to Plaintiff Milton Steinman's Motion for Remand). The Objection requests the Court to disallow Steinman's claim in its entirety based on offsets for which Steinman is allegedly liable; however, unlike Phoenix's Objection, the Argus Objection does not contain a counterclaim.

*NEED FOR FINANCING.* At the Hearing, Debtors presented C. Spencer to testify in support of the legitimacy of their bankruptcy filings. In the course of his testimony, he provided some general background information regarding the Property. He testified that when the Property was originally acquired, it was only 17% occupied, but that by January of 1995, the occupancy level had been increased to 100%. Transcript at 76. However, this level did not remain the same. During the past year, the fourth and sixth floors have been unoccupied, causing the occupancy level to drop from 100% to the current level of 80%. *Id.* at 76–77, 104.

According to C. Spencer, Phoenix has an individual who is interested in leasing the entire fourth floor. The parties have negotiated a five-year lease which the prospective tenant has approved. It provides for the tenant to pay rent commencing December 1, 1996 of $1,792 per month with an increase every year. *Id.* at 104–105. Phoenix has not executed the lease with this tenant because Phoenix lacks the cash flow necessary to pay the commission due for the lease, which C. Spencer estimates to be $3,000 to $4,000, and perform the tenant fit-out work required to prepare the fourth floor for the prospective tenant's occupancy, which he estimates will cost approximately $16,000. *Id.* at 89–91, 105–106.

In the event the lease for the fourth floor is consummated and all of Phoenix's current tenants remained, the occupancy level for the building would increase to over 90%. *Id.* at 76. However, Phoenix was advised during the thirty day period prior to the Hearing that a tenant on the first floor of the building, namely a retail printing shop whose rent is $4,500 per month, would be vacating its premises as of October 1, 1996. *Id.* at 77–78. According to C. Spencer, the departure of this tenant will affect Phoenix's future cash flow situation. He projected that, after paying its debt service, Phoenix will have only $800 in excess cash in October, and in November, it will not even have sufficient funds to cover its mortgage. *Id.* at 77–78.

In order to remedy Phoenix's cash flow problem, C. Spencer is willing to lend the limited partnership $100,000. This loan would enable Phoenix to pay the commission and perform the tenant fit-out work for the fourth floor lease. With the fourth floor tenant intact Phoenix's cash flow would increase by $1,792 per month. *Id.* at 80. According to C. Spencer, this increase would enable Phoenix to cover its debt service for "some period of time," but "additional monies [would still be needed] as early as March of '97 and then beyond that, for some other reasons." *Id.* Presumably, C. Spencer's loan of $100,000 would provide these needed "additional monies." C. Spencer also testified that in March of 1997, Phoenix will have taxes that become due of about $37,000 to $40,000 and that, in the past, Phoenix has paid these taxes in one lump sum. *Id.* at 102–103. While not explicitly stated, it is assumed from this testimony that Phoenix will utilize some of the $100,000 to pay its taxes. C. Spencer further testified that the $100,000 would be used to perform improvements and tenant fit-outs as required to keep Phoenix's existing tenants and attract new tenants to the building, *id.* at 102, and would provide Debtors with "a little extra room" for unaccounted for expenses. *Id.*

According to C. Spencer's projections, unless Phoenix obtains this loan from him, it will have a negative cash flow of $50,189 for the first 12 month period and $128,612 for the next 12 month period. *Id.* at 99–100; Exhibit D–1B. In contrast, with the loan the partnership will have a positive cash flow of

$36,399 for the first 12 month period and $100,638 for the second 12 month period. *Id.*

C. Spencer is willing to extend this loan to Phoenix because he believes there was value in the partnership in the past and there can be value in it again, "given a chance to get the property leased back up and build up the cash flows. And then [to] eventually sell the property." *Id.* at 83. He believes this re-building of value can be done in "a reason-ably short period of time" and that it would result in all of the partners being paid. *Id.* at 83–84. He testified that he had mentioned the plan to all of the other limited partners and they were all for it. *Id.* at 84.

Importantly, C. Spencer is imposing two conditions on his agreement to extend this loan to Phoenix. First, the loan must be Court-approved. *Id.* at 82, 109. His stated reason for requiring such approval is to pre-vent Steinman from alleging in the future that the financing was "inappropriate, illegal" etc., as he contends Steinman is alleging with respect to financing that occurred in the past. *Id.* His second condition concerns Steinman's Motion for a Trustee. According to C. Spencer, if a Trustee is appointed by the Court, he will have to "seriously recon-sider" whether to make the loan.[14] *Id.* at 84. Explaining his reasoning for this, C. Spencer testified that, in his opinion, the appointment of a Trustee would "send[ ] a signal to the marketplace that the property is in a lot of trouble, [that] this is a property that it is not going to be improved ... that is going to be sold ... and the vultures [will] start to swarm ... it will destroy the equity in the property[.]" *Id.* at 84–85.

14. Subsequent to the Hearing, in recognition that the Motion for Trustee would not be re-solved consistent with the timing of Debtors' need for funds, the second condition was waived and the amount of the financing reduced to the amount needed to fund the new fourth floor lease. Based on these changes in Debtors' re-quest for financing, the parties submitted a con-sent order ("Consent Order") for the financing to the Court. This Consent Order is docketed as of October 23, 1996.

15. In Steinman's supplemental memorandum in support of his Remand Motion, he requests the Court to abstain and remand this action or, in the alternative, "to sever the non-debtor defen-dants who have not opposed his motion for re-

## DISCUSSION

### I. *MOTION FOR REMAND*

Pursuant to 28 U.S.C. § 1452(b), the court to which a claim or cause of action has been removed "may remand such claim or cause of action on any equitable ground." [15] Prior decisions in this district have held that where grounds for mandatory or discretionary ab-stention are present under 28 U.S.C. § 1334(c), then remand is proper. *Comput-erware, Inc. v. Micro Design, Inc. (In re Micro Design, Inc.)*, 120 B.R. 363, 366 (E.D.Pa.1990) (adopting report and recom-mendations of bankruptcy court); *In re Josh-ua Slocum,* 109 B.R. 101, 105 (E.D.Pa.1989) (adopting report and recommendations of bankruptcy court). Neither party disputes this proposition of law; rather, they both apply it in setting forth their arguments on the Motion.

Steinman contends that we should remand this matter to the State Court because the grounds for both mandatory and discretion-ary abstention under 28 U.S.C. § 1334(c) are met. Not surprisingly, Debtors contend the opposite is true—that neither the require-ments for mandatory nor discretionary ab-stention are met. We reject both of these viewpoints, finding that while not all of the grounds for mandatory abstention are not met, discretionary abstention would be ap-propriate.

### A. Mandatory Abstention

■ The basis for mandatory abstention is set forth in § 1334(c)(2), which states, in relevant part:

mand." Plaintiff Milton Steinman's Supplemen-tal Memorandum in Support of his Motion for Remand at 8 & n. 8. However, Steinman pro-vides no authority for, nor discussion regarding, this alternative request for relief. For this rea-son, we do not believe the request to be properly before this Court. Moreover, as the non-debtor's counsel emphasized at the Hearing, his clients were never served with a copy of the Remand Motion filed in this Court and, therefore, were not required to file any response thereto. Tran-script at 46–47. In any event, based upon the non-debtor's representations at the Hearing, it is obvious that they do oppose Steinman's request for remand as well as his request for alternative relief.

Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2). As held in *Federal National Mortgage Association v. Rockafellow (In re Taylor)*, 115 B.R. 498 (E.D.Pa. 1990) (adopting report and recommendations of bankruptcy court), mandatory abstention pursuant to the aforementioned provision is appropriate only when the following six requirements are met:

(1) a timely motion is made;

(2) the proceeding is based upon a state law claim or state law cause of action;

(3) the proceeding is a related case under Title 11;

(4) the proceeding does not arise under Title 11;

(5) the action could not have been commenced in a federal court absent jurisdiction under 28 U.S.C. § 1334; and

(6) an action is commenced, and can be timely adjudicated, in a state forum of appropriate jurisdiction.

*Id.* at 500. Debtors do not dispute that the first, second and third requirements are met.[16] However, they do contend that the other requirements are lacking. Our discussion will focus on the requirements in dispute.

**(i) The Fourth Requirement**

With regard to the fourth requirement, namely that the proceeding does not arise under Title 11, Steinman argues that:

The claims in this case do not involve rights created by bankruptcy law, nor do they arise only in bankruptcy. The instant action is based solely on rights asserted under and governed by Pennsylvania state law and properly adjudicated in a state forum. No bankruptcy claims are made. Accordingly, the instant claims are not "arising in" or "arising under" the bankruptcy laws.

Plaintiff Milton Steinman's Motion for Remand at 10. While Debtors do not dispute Steinman's characterization of the claims which he raised in State Court as purely state law causes of action, they contend that because he filed Proofs of Claim involving the same claims, he transformed his prepetition state law causes of action against Phoenix into a core proceeding arising under Title 11. They base this assertion on § 157(b)(2)(B) of the Code which provides that core proceedings include "allowance or disallowance of claims against the estate[.]" Debtors' proposition that the filing of a proof of claim in bankruptcy transforms a prepetition state law claim which was filed in state court before the bankruptcy into a core proceeding is sound. *See e.g.*, *S.G. Phillips Constructors, Inc. v. City of Burlington, Vermont (In re S.G. Phillips Constructors, Inc.)*,

---

16. At the conclusion of the section in their Surreply Memorandum in Opposition to Plaintiff Milton Steinman's Motion for Remand devoted to the issue of whether the Steinman Litigation is a core proceeding, Debtors make the conclusory assertion that, since the Steinman Litigation *arises under title 11 and is a core proceeding*, it is "not 'related to' a case under title 11[.]" *See* Debtors' Surreply Memorandum in Opposition to Plaintiff Milton Steinman's Motion for Remand at 28. However, in concluding below, *see infra* at 747–750, that this matter is not a core proceeding, the Debtors' reasoning fails. Since Debtors do not further or separately address the "related to" requirement, it would seem that they do not have any other argument in opposition to Steinman's contention that the "related to" requirement has been met. In any event, that this proceeding is related to the Debtors' case appears clear. *See Brock v. Morysville Body Works, Inc.*, 829 F.2d 383, 385 (3d Cir.1987) (*quoting Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984)) (" 'An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and in any way impacts upon the handling and administration of the bankrupt estate.' "). The proceeding involves, *inter alia*, a claim against Phoenix for the appointment of a receiver. The outcome of such a claim could affect Phoenix's "freedom of action" and would impact upon the handling and administration of the bankrupt estate.

45 F.3d 702 (2d Cir.1995); [17] *Livesey v. Kates (In re Mazzocone)*, 1993 WL 340942 (Bankr. E.D.Pa.1993). However, this result only obtains where the proof of claim raises the same claims as the state law action. *See St. Vincent's Hospital v. Norrell (In re Norrell)*, 198 B.R. 987, 993–994 (Bankr.N.D.Ala.1996) (since the factual basis of creditor's proof of claim is the same as the removed cause of action which the creditor originally filed against the debtor pre-petition and the debtor disputes the validity of the creditor's claim, the removed proceeding involves the allowance and disallowance of a claim against the estate and it constitutes a core proceeding). Here the Steinman Proofs of Claim do not raise the same claims as those involved in the Steinman Litigation and accordingly, their filing does not convert the Steinman Litigation into a core proceeding.[18]

Steinman's Complaint contains six counts against Argus. These counts state claims for fraudulent misrepresentation and concealment; negligent misrepresentation; breach of its fiduciary duty; disgorgement; an accounting; and breach of the limited partnership agreement. In contrast, the claims against Argus in Steinman's Proof of Claim are for monies allegedly owed for attorney's fees as a result of the Superior Court's Order and for sanctions imposed by the State Court. Obviously these claims do not overlap. In deciding whether Steinman has a valid claim in bankruptcy against Argus, we would not be deciding the merits of the claims stated against Argus in State Court. Accordingly, Steinman's Proof of Claim against Argus does not raise the claims at issue against it in the Steinman Litigation.[19]

**17.** *See also Banlavoura–I, Inc. v. McCarthy, Gyemant & Babbits (In re M,G & B, Inc.)*, 1996 WL 241703, at *1–*3 (N.D.Cal. May 2, 1996) (purely state law cause of action which was originally filed by plaintiffs against debtor and other defendants in state court prior to debtor's bankruptcy, but was subsequently removed to bankruptcy court by debtor, constituted "at most, ... a noncore proceeding 'related to' a title 11 case" since plaintiff had not filed proof of claim in debtor's bankruptcy case"); *Wood, III v. Wood (In re Wood)*, 825 F.2d 90 (5th Cir.1987) (where plaintiff, who did not file proof of claim in bankruptcy case, filed adversary action against debtors raising purely state law causes of action, adversary action constituted non-core related proceeding).

**18.** As explained above, *see supra* at 744–745, after filing his Proofs of Claim against Debtors, Steinman filed a series of three amendments to the Proofs of Claim against each Debtor. The third amendment to his Phoenix Proof of Claim deleted his demand of $744,250.00 for lost value of his partnership interest. However, before Steinman filed his second and third amended Proofs of Claim, Debtors filed their objections to the claims. According to F.R.Bankr.P. 3006, after a debtor has filed an objection to a creditor's proof of claim, the creditor may not withdraw his claim "except on order of the court after a hearing on notice to the trustee or debtor in possession ... [.]" Since Steinman did not obtain an order of this Court, he acted improperly in withdrawing part of his claim by way of the third amendment.

Moreover, since Phoenix included a counterclaim for equitable subordination in its objection, F.R.Bankr.P. 3007 applies. This rule states that "[i]f an objection is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding." Rule 7001

states, in pertinent part: "An adversary proceeding ... is a proceeding to subordinate any allowed claim or interest[.]" Since Phoenix's counterclaim asks for equitable subordination of Steinman's claim, the claim and objection became an adversary proceeding to which Rule 7015 is applicable. *See Northeast Office and Commercial Properties v. Smith Valve Corp., (In re Northeast Office and Commercial Properties)*, 178 B.R. 915, 921 (Bankr.D.Mass.1995). Under Rule 7015, which concerns "Amended and Supplemental Pleadings," if a responsive pleading has been filed, a party may amend his pleading only "by leave of court or written consent of the adverse party[.]" Since Phoenix filed an objection to Steinman's Proof of Claim, Steinman was not at liberty to subsequently amend his claim without leave of court or Phoenix's written consent.

Based on these procedural deficiencies in the second and third amended Proofs of Claim, the Court's analysis will focus on Steinman's Proofs of Claim and first amended Proofs of Claim (latter of which merely attach supporting documentation) which will be referred to as the Proofs of Claim.

**19.** Since the bar date that was set in this case has passed and Steinman did not file a proof of claim seeking to recover from the estate for the claims which he asserted against Argus and Phoenix in the Steinman Litigation, such claims would be discharged in bankruptcy. *See Benedor Corporation v. Conejo Enterprises, Inc. (In re Conejo Enterprises, Inc.)*, 96 F.3d 346, 353 (9th Cir.1996) (if creditor does not file a proof of claim seeking to recover against the estate for claim raised against debtor in pending state court action, the claim in the state court action is discharged in bankruptcy). With the potential of a discharge of liability against the claims assert-

Insofar as Phoenix, Steinman's Complaint contains three counts against it. In two of these counts, namely Counts V and VII, equitable relief is sought in the form of a receiver and an accounting. In the third count, Count VIII, Steinman seeks monetary damages for breach of the partnership agreement.

Steinman's Proof of Claim against Phoenix, on the other hand, consists of the following three components: (1) attorney's fees owed as a result of the Superior Court Order; (2) the monetary sanction imposed by the State Court; and (3) the value of Steinman's partnership interest in Phoenix which he asserts is $744,250.00. Since no claim for equitable relief is sought in the Proof of Claim, the claims (for equitable relief) set forth in Counts V and VII of the Complaint are not implicated. The Court's focus is therefore solely upon Count VIII of the Complaint for breach of the partnership agreement. Plainly, the components of Steinman's Proof of Claim for attorney's fees owed as a result of the Superior Court Order and the monetary sanction imposed by the State Court do not state a claim for breach of the partnership agreement. As is the case with Argus, the attorneys' fees and sanctions component of the claim are not raised by the Counts of Steinman's Complaint.

 The only other component of the Proof of Claim is for the value of Steinman's interest in the limited partnership. The Proof of Claim provides no clue as to why Steinman believes the estate owes him the value of his interest in the Debtor.[20] Notably, the description given on Steinman's Proof of Claim for the "basis of claim" is "fraud in the sale of securities; court ordered sanctions." Upon first glance, this description gives the impression that the Proof of Claim raises the same securities violation claim asserted by Steinman in State Court. However, the securities violation claim asserted in State Court was against the Spencers and the Arden Group. *See* Complaint ¶¶ 158–183. It was not against Phoenix or Argus. The only documentation attached to the Proof of Claim with regard to this component of the claim is a copy of the Financial Statement of Craig and Barbara Spencer as of September 30, 1995, which identifies the market value of the Property as $3,250,000 and the mortgage thereon as $1,100,000, as presumed, but unexplained support for Steinman's belief that his 22.9% partnership interest is equal to $744,250.50. However, since the measure of damages applicable to Steinman's Count VIII claim for breach of the partnership agreement would be the loss to him caused by the alleged breaches of such agreement[21] and not the value of his interest in the partnership, which is what this third component of his Proof of Claim seeks, there is a basis for concluding that this third component of the Proof of Claim does *not* state a claim for breach of the partnership agreement. As such, the claims set forth in Steinman's Proof of Claim against Phoenix are different from the claims against Phoenix in the Steinman Litigation. Because Stein-

ed in the Steinman Litigation against Debtors, it seems contrary to Debtors' best interests for them to be arguing that Steinman's Proofs of Claim raise the same claims stated against them in the Steinman Litigation. Query whether this litigation strategy is not reflective of a continuing failure to identify the separate interests of the Debtors and non-Debtors notwithstanding the appointment of separate counsel to obviate that harm. *See* August 6, 1996 Opinion.

20. Rule 3003 of the Federal Rules of Bankruptcy Procedure provides for the filing of proofs of interest by equity security holders. Steinman's proof of claim for the lost value of his partnership interest seems more akin to a proof of interest.

21. Since a partnership agreement is a contract, *see McClimans v. Barrett*, 276 Pa.Super. 557,

561–562, 419 A.2d 598, 600 (1980), the damages recoverable by Steinman for breach of the partnership agreement would be the loss to him proximately caused by the alleged breaches, *see 222 Liberty Associates v. EESCO Electric, Inc. (In re 222 Liberty Associates)*, 101 B.R. 856, 863 (Bankr.E.D.Pa.1989) (damages recoverable by plaintiff in a contract action must be have been proximately caused by the actions of the breaching party); *Logan v. Mirror Printing Company*, 410 Pa.Super. 446, 448, 600 A.2d 225, 226 (1991) ("In order to recover for damages pursuant to breach of contract, the plaintiff must show a causal connection between the breach and the loss."). In the Complaint, Steinman identifies the alleged breaches as the mortgaging of Phoenix property "without the consent of 51% of the limited partners" and the paying of "distributions to limited partners when Phoenix or its affiliates was indebted for principal and interest on loans." Complaint ¶¶ 241–244.

man's Proofs of Claim have not converted the removed action into a core proceeding, such proceeding, which involves only state law causes of action, does "not arise under Title 11" and the fourth requirement for mandatory abstention is met.[22]

### (ii) The Fifth Requirement

 In order to satisfy the fifth requirement, it must be shown that this proceeding could not have been commenced in a federal court absent jurisdiction under 28 U.S.C. § 1334, which governs cases "under title 11" and proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a) & (b). Although Steinman admits that the parties involved in this proceeding are diverse, see Plaintiff Milton Steinman's Motion for Remand at 10 (Steinman is a citizen of Florida while defendants are Pennsylvania citizens), he contends that the fifth requirement is satisfied because defendants could not have removed this proceeding to federal court. However, the fifth requirement focuses upon whether the action could have originally been commenced in federal court absent jurisdiction under § 1334 and not whether the action could have been removed. Steinman provides no authority for analyzing the fifth requirement in terms of removal. Accordingly, given the diversity of citizenship of the parties and the fact that the damages claimed in the Complaint are in excess of the arbitration limits of the State Court,[23] this proceeding could have originally been commenced in federal court under federal diversity jurisdiction and, therefore, that the fifth requirement is not met.

### (iii) The Sixth Requirement

 In order to satisfy the sixth requirement, an action must have been commenced that can be timely adjudicated in a state forum of appropriate jurisdiction. Since the Steinman Litigation was originally commenced in State Court approximately one year ago and the State Court is a state forum of appropriate jurisdiction to decide this matter, the only issue to be determined is whether the action could be timely adjudicated in State Court. There appears to be no reason why it cannot be.

The litigation was originally proceeding in State Court with discovery progressing and a trial ready date scheduled for January, 1997. The progress of the case was interrupted by the stay that was briefly imposed by the Superior Court and then by Debtors' bankruptcy filings. At this point, however, discovery on the litigation has re-commenced since, at the Hearing, the parties agreed that they would move forward with that discovery. Accordingly, there is no basis in the record for concluding that the litigation could not get back on track in State Court.[24]

---

**22.** Even if the Court concluded that this matter constituted a core proceeding under the circumstances present here, the removed action would be remanded because discretionary abstention under § 1334(c)(1) is appropriate. See Lawrence King, Collier on Bankruptcy ¶ 3.01 at 3-75 (whereas mandatory abstention under § 1334(c)(2) is only applicable to state law claims or causes of action "related to" a case under title 11 but not arising under title 11 or arising in a case under title 11, discretionary abstention under § 1334(c)(1) applies to core matters as well as to related matters). See also St. Vincent's Hospital v. Norrell (In re Norrell), supra, 198 B.R. at 990–997 (applying discretionary abstention under § 1334(c)(1) to removed action which constituted core proceeding because the subject of the action also formed the basis of the creditor's proof of claim against the estate).

**23.** The Court takes judicial notice of the fact that the arbitration limit applicable in State Court is less than $50,000. The monetary damages sought in the Complaint in the Steinman Litigation are "in excess" of the State Court's arbitration limits.

**24.** If this bankruptcy case were to continue, to the extent there are extent claims against the Debtors (as opposed to the non-debtor defendants) in the Steinman Litigation not barred by the claim bar date, Steinman would have to seek relief from the automatic stay to proceed against the Debtors in State Court. However, given the conclusion that abstention is appropriate, relief from the stay would presumably be granted and would not be an impediment to the timely adjudication of this matter in State Court. Moreover, Debtors have evidenced no intention to utilize the bankruptcy stay to shield them from resolution of the Steinman Litigation. They and the non-debtor defendants merely wish this Court, as opposed to the State Court, to be the adjudicative body.

Admittedly, Debtors allege that improprieties have occurred in State Court. However, we cannot base a conclusion that the Steinman Litigation cannot be timely adjudicated merely on such allegations. The allegations do not prove that improprieties have occurred. Moreover, Debtors have sought redress for the alleged improprieties by filing the Federal Action. Therefore, Debtors are not without an avenue to have the alleged improprieties addressed and reviewed.

### (iv) Mandatory Abstention Not Applicable

In short, we find that only the fifth requirement is not met. Nevertheless, because this requirement is lacking, mandatory abstention under § 1334(c)(2) would not be appropriate. However, discretionary abstention under § 1334(c)(1) may still apply.

### B. Discretionary Abstention

Courts in this jurisdiction have repeatedly held that when most or all but one of the requirements for mandatory abstention are met, careful consideration should be given to whether it would be appropriate to exercise discretionary abstention under § 1334(c)(1). *See Wolser v. Joshua Slocum, Ltd.(In re Joshua Slocum, Ltd.), supra,* 109 B.R. at 107; *Federal National Mortgage Association v. Rockafellow (In re Taylor), supra,* 115 B.R. at 502; *U.I.U. Health and Welfare Fund v. Levit (In re Futura Industries, Inc.),* 69 B.R. 831, 834 (Bankr.E.D.Pa. 1987).

Section 1334(c)(1) states:

Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1). In determining whether to exercise discretionary abstention under this section, courts focus upon a variety of factors. Some courts apply the following list of factors:

(1) the effect or lack thereof on efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of applicable state law; (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted "core" proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden of the bankruptcy court's docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; and (11) the presence of non-debtor parties.

*See Milford Group, Inc. v. Northeastern Bank of Pennsylvania (In re Milford Group, Inc.),* 164 B.R. 892, 898 (Bankr.M.D.Pa.1993); *Alexander v. Gismondi & Margolis (In re Gentilcore),* 1993 WL 5897 (Bankr.W.D.Pa. Jan. 5, 1993). Focusing upon this list, and assuming that any of the Counts against *Debtors* in the Complaint have been preserved by a timely filed proof of claim, a number of these factors weigh heavily in favor of discretionary abstention.

First, there are no issues of bankruptcy law raised by the Complaint. Rather, the proceeding involves purely state law claims which were originally filed in State Court.

Second, resolution of this litigation would be a burden on this Court's docket. There is nothing in this litigation which requires the expertise of this Court—it is a partnership dispute involving state law claims. The claims in this proceeding are principally directed at the non-debtor defendants. As we noted in the August 6, 1996 Opinion, "the thrust of the [Steinman Litigation] is a charge of misconduct on the part of the Spencers in soliciting investment in Phoenix and the Spencers and the Arden Group in mismanaging Phoenix." Opinion at 13. With over two thousand more bankruptcy cases filed in this Court during the first eight months of this year than in either of the past two years, it would be a misdirection of this

Court's scarce resources to decide these claims.

■ Finally, Debtors appear to have filed for bankruptcy solely because the defendants were dissatisfied with the treatment and rulings which they were receiving in State Court and were seeking another forum in which to defend the Steinman Litigation. This conclusion follows from the fact that although the Steinman Litigation had been pending since October of 1995, Debtors did not file for bankruptcy until May of 1996, when they learned that the Superior Court had vacated its stay and that they would have to proceed in State Court. Significantly, Debtors' financial conditions did not force them to file their cases.[25] Indeed, when the bankruptcies were filed, Phoenix was current on its obligation to its mortgagee and operating on a "better than break even basis." Its Schedules confirm that it has little unsecured debt other than the Rosen Firm's claim and there is no evidence that the Rosen Firm was complaining about not being paid. Indeed, that firm sought to continue its representation of Debtor in this Court. Furthermore, rather than leaving this litigation in State Court where it was commenced and taking advantage of the automatic stay to obtain some breathing room, Debtors immediately removed the litigation to this Court seeking to have it proceed here. These facts lead the Court to the logical conclusion that by filing for bankruptcy, Debtors were merely shopping for another forum in which to have the Steinman Litigation decided. *See Goya Foods, Inc. v. Unanue–Casal (In re Unanue–Casal),* 164 B.R. 216 (D.P.R.1993) (reversing bankruptcy court's decision not to abstain under mandatory or discretionary abstention where it was "extremely likely that the filing of the bankruptcy action amounted to forum shopping" and there was evidence that the Debtor's petition for bankruptcy [was] a sham, because he [was] not 'financially distressed' "), *aff'd,* 32 F.3d 561 (1st Cir.1994),

*cert. denied,* —— U.S. ——, 115 S.Ct. 1098, 130 L.Ed.2d 1066 (1995); *Gabel v. Engra, Inc. (In re Engra, Inc.),* 86 B.R. 890, 895 (S.D.Tex.1988) (reasoning that one of the factors "militating in favor of permissive abstention" was court's suspicion that in filing for bankruptcy, debtors were "merely seeking another forum in which to litigate this action").

Based on these factors, the Court concludes that the Steinman Litigation should be decided in State Court where it was originally brought, where it was proceeding and where it would have remained had defendants and their counsel not decided that this Court provided them with a means to circumvent the State Court's jurisdiction. Accordingly, Steinman's Motion for Remand is granted.

## II. *DISMISSAL*

■ Under the appropriate circumstances, this Court has the power to *sua sponte* dismiss a bankruptcy case under § 1112(b), *see In re SB Properties, Inc.,* 185 B.R. 206, 208 (Bankr.E.D.Pa.), *motion to set aside dismissal of appeal denied,* 185 B.R. 198 (E.D.Pa.1995); *In re Daily Corporation,* 72 B.R. 489 (Bankr.E.D.Pa.1987); *In re Harvey Probber, Inc.,* 44 B.R. 647, 648–652 (Bankr.D.Mass.1984); *In re Coram Graphic Arts,* 11 B.R. 641 (Bankr.E.D.N.Y.1981), or under § 305(a), *see Del Webb Commercial Properties Corporation v. Churchill Development Ltd. (In re Churchill Development Ltd.),* 74 B.R. 187, 190 (Bankr.D.Ariz.1987); *In re Harvey Probber, Inc., supra,* 44 B.R. at 648–653; *In re Coram Graphic Arts,* 11 B.R. 641 (Bankr.E.D.N.Y.1981); *Continental Illinois National Bank and Trust Company v. Century City, Inc. (In re Century City, Inc.),* 8 B.R. 25, 28 (Bankr.D.N.J.1980). The applicability of both of these sections will be examined.

---

**25.** Spencer's testimony that Phoenix's financial condition will be negatively impacted by the departure of the retail printing shop tenant which leased space on the first floor of the Property and that he will not advance Phoenix a loan without Court protection does not suggest a contrary conclusion. The retail printing shop did not

even advise Phoenix that it would be moving out of the Property until late in August; the bankruptcy was filed in early May. Moreover, it would be improper to file a bankruptcy case simply to obtain the Court's imprimatur of a partnership loan to preempt future suit by an alienated partner.

### A. Dismissal Under § 1112(b)

■ Section 1112(b) of the Bankruptcy Code provides that a court may dismiss or convert a chapter 11 case to one under Chapter 7, "whichever is in the best interests of creditors and the estate for cause." While the statute does not define the term cause, it provides a list of illustrative examples of cause. The list is not exhaustive. *First Jersey National Bank v. Brown (In re Brown),* 951 F.2d 564, 572 (3d Cir.1991).

■ Not included within the list of enumerated examples is lack of good faith in filing. However, as noted by the court in *In re SB Properties, Inc.,* 185 B.R. 198, 203 (E.D.Pa.1995), "the overwhelming majority of courts considering the issue agree that an implicit good faith filing requirement exists under § 1112(b), and that a Chapter 11 case may be dismissed for cause if it was filed in bad faith." *Id.* at 203 & 204 n. 3 (citing cases). The issue of whether bad faith exists in a particular case is a question of fact to be decided by examining the totality of the circumstances. *Id.* at 204.

Dismissal based upon bad faith in filing has been deemed appropriate where the bankruptcy petition was filed as a litigation tactic, a forum shopping device and/or to resolve what is essentially a two-party dispute. *See In re SB Properties, Inc., supra,* 185 B.R. at 209–210 (case dismissed as being filed in bad faith where debtor had no significant creditors other than mortgagee and case was "essentially a two party dispute which was obviously commenced for the sole purpose of relocating pending litigation over the liquidation of the Property from the [state court] to this Court"); *In re C–TC 9th Avenue Partnership,* 193 B.R. 650, 654 (Bankr. N.D.N.Y.1995) (bankruptcy case dismissed where it was "clear that the primary motivation for, and characteristic of, Debtor's Chapter 11 case was dispute with [one creditor]" and debtor "filed Chapter 11 when it perceived that the State Court litigation took an unfavorable turn."); *Monsour Medical Center, Inc. v. Stein (In re Monsour Medical Center, Inc.),* 154 B.R. 201, 209 (Bankr. W.D.Pa.1993) (where filing of bankruptcy case was blatant forum shopping intended to reverse setbacks suffered in another forum, bankruptcy case dismissed as having been filed in bad faith); *In re Melp, Ltd.,* 143 B.R. 890, 893 (Bankr.E.D.Mo.1992) (noting that bankruptcy court "should not be used as an alternative approach to state court procedures to resolve intra-company management and ownership disputes" and that "bankruptcy courts should become involved in cases only if the bankruptcy court's services are needed to truly reorganize a debtor who is having financial problems"); *In re Walter,* 108 B.R. 244, 250 (Bankr.C.D.Cal.1989) (dismissal under § 1112(b) is proper remedy where bankruptcy petition was a forum shopping device); *In re First Financial Enterprises, Inc.,* 99 B.R. 751, 756 (Bankr. W.D.Tex.1989) (bankruptcy case dismissed under § 1112(b) as bad faith filing since "obvious purpose" in filing case was "to use the Chapter 11 filing as a litigation strategy"); *In re Business Information Company,* 81 B.R. 382, 385 (Bankr.W.D.Pa.1988) (noting that "[s]everal courts have held that the filing of a bankruptcy petition as a litigation tactic, or to resolve what is essentially a two-party dispute, is an indication of a bad faith filing."). Based on the totality of circumstances in this case, dismissal under § 1112(b) is appropriate.

Debtors filed this case for an improper purpose, namely as a means to forum shop.[26] As stated above, defendants in the Steinman Litigation were dissatisfied with the treatment they were receiving in the State Court and desired another forum in which to litigate their dispute. Debtors commenced their bankruptcy cases to remove their dispute from the State Court to this Court.

Debtors' motivation in filing for bankruptcy is inferred from the timing of their bankruptcy filings *vis-a-vis* the status and prog-

---

**26.** We also find that bad faith exists because this case was filed to resolve what is, in essence, a partnership dispute. With few creditors involved in this case and the Debtors paying their debts as they come due, the focus of this bankruptcy case is the Steinman Litigation. Although three entities and two individuals are named in this litigation, it is primarily a dispute between Steinman and the Spencers over the Spencers' conduct and dealings with regard to Steinman and the non-individual defendants, namely Argus, Phoenix and the Arden Group.

ress of the Steinman Litigation; the fact that, immediately after their filings, Debtors removed this litigation to this Court and sought to proceed with it here; and Debtors' sound financial condition when they filed their petitions. As Debtors' Schedules show, Phoenix has only one secured creditor, namely its mortgagee, and little unsecured debt other than the attorneys' fees owed to the Rosen Firm. When it filed its petition, Phoenix was current on its obligation to its mortgagee and was operating on a "better than break-even basis." Argus' Schedules reveal the same picture except that its obligation to Phoenix's mortgagee is listed as an unsecured debt. What this evidence indicates is that Debtors' financial condition did not necessitate their bankruptcy filings; they did not need to utilize the bankruptcy system in order to obtain a breathing spell and reorganize their debts. Rather, their debts were still being incurred and paid in the ordinary course of their business. As such, the impetus for filing must have been something else. What that "something else" was is apparent from the timing of their filing—it was their desire to remove the Steinman Litigation from State Court.

Cognizant of this Court's concern that their bankruptcy case was filed without a legitimate bankruptcy purpose, Debtors sought to justify their bankruptcy filings at the Hearing by presenting evidence to explain why their case is currently necessary. To this end, they presented evidence designed to show that: (i) Phoenix's financial condition has deteriorated since the filing of its bankruptcy petition due to the departure of one of its first floor tenants; (ii) Phoenix needs to obtain financing in order to secure a tenant for the fourth floor of the Property and improve its financial picture; (iii) Spencer is the only available source from whom such financing can be obtained; (iv) he is willing to advance Phoenix a loan of $100,000 on the conditions that it is approved by the bankruptcy court and Steinman's Motion for a Trustee is denied; and (v) without the loan

from C. Spencer for $100,000, Phoenix will have a negative cash flow over the next two year period. None of this evidence alters our conclusion that Debtors' bankruptcy cases were filed in bad faith and should be dismissed. Even ignoring the issue of whether a debtor may justify its bankruptcy filing by post-petition events, which we believe is, in and of itself, an obstacle to Debtors' asserted justifications for their case, we do not find that Phoenix's current financial situation or its desire for court approval of its financing present a reason for Debtors to be in bankruptcy.

Admittedly, Phoenix's financial condition will be impacted by the loss of its first floor tenant until it obtains a replacement tenant for that space. However, Phoenix has succeeded in finding a tenant for the fourth floor of the Property which is space that has been vacant for the past year. As even C. Spencer testified, with this new tenant's rent, Phoenix will be able to cover its debt service for "some period of time," which, in subsequent testimony, he identified as until March of next year. According to Debtors, the only impediment to executing the lease with this tenant was Phoenix's need to obtain financing to perform the fit-out work necessary for this tenant and to pay the commission due on the lease, which C. Spencer estimated would cost a total of $19,000. Since the Hearing, a loan to cover this amount has been agreed upon by the parties and approved in the form of a consent order by this Court. *See supra* footnote 14. Therefore, Phoenix should be in a position to cover its debt service for not only the immediate future, but until the spring of next year. As such, its financial condition does not provide a basis for Debtors' bankruptcy case.

To the extent that Phoenix will need additional funds this spring, C. Spencer, in proffering funds of $100,000 to the Debtors, apparently has the resources to solve any future cash deficiencies.[27] At the Hearing C. Spencer testified that he felt a personal commitment to the partnership to provide it with financing when it was needed (assum-

---

**27.** While Debtors presented C. Spencer's projections comparing Phoenix's cash flow over the next 24 months with and without a loan from him for $100,000, they did not present any projections showing what Phoenix's cash flow situa-
tion would be with a loan from him limited to the amount which we have approved. Thus, we cannot ascertain what and when further cash advances will be required.

ing that he was financially able to do so) and that, prior to the Steinman Litigation, he had honored this commitment by extending loans without court-approval. Transcript at 82, 108–109. It is only because of the Steinman Litigation that he is requiring his loans to Phoenix to be court-approved so that he will have protection against Steinman should he later complain that the loans were inappropriate, illegal, etc. *Id.* at 82, 109.

Bankruptcy courts do not exist to provide approval of partnership loans independent of the partnership's need to reorganize or to provide partners with protection from future lawsuits. In the event Phoenix desires to obtain additional funding from C. Spencer, it will have to convince him to resort to the practice which existed prior to the Steinman Litigation, *i.e.*, extending loans without court approval,[28] or obtain financing from another source. Moreover, if a condition to future financing, waived with respect to the recent loan, is that Steinman's Application for a Trustee be denied, the dismissal of this case moots that application. While the claim for a receiver in the Steinman Litigation arguably may present the same obstacle to financing, the litigation of that issue in State Court will determine whether that financing condition, if not waived, is met.

In sum, the Court finds that Debtors' cases were filed in bad faith. To allow this case to continue would be to sanction their improper use of the bankruptcy system. Dismissal of this matter is warranted under § 1112(b).

**B.** Dismissal Under § 305(a)

Section 305(a) states, in pertinent part:

The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if ... the interests of creditors and the debtor would be better served by such dismissal or suspension[.]

11 U.S.C. § 305(a)(1). By adopting this section, Congress recognized that in certain cases it may be appropriate for a bankruptcy court to decline jurisdiction. *In re Walter,*

*supra,* 108 B.R. at 250 (quoting Notes of Committee on the Judiciary Senate Report No. 95–989, U.S.Code & Admin.News 1978, p. 5821); *In re Business Information Company, Inc., supra,* 81 B.R. at 386–387. As with § 1112(b), the decision whether to dismiss under § 305(a) is discretionary and must be made on a case-by-case basis. *In re A & D Care, Inc.,* 90 B.R. 138, 141 (Bankr. W.D.Pa.1988); *In re Business Information Company, Inc., supra,* 81 B.R. at 386–387.

In applying § 305(a), "courts have considered a wide range of factors, including but not limited to who filed the bankruptcy petition, the availability of another forum to resolve the pending disputes, the necessity of federal proceedings to achieve a just and equitable solution, the expense of the federal proceedings in comparison with the proceedings in another forum, the purpose of the party seeking to remain in bankruptcy court, the economy and efficiency of having the bankruptcy court handle the matter and the possible prejudice to various parties." *In re Carl Mazzocone,* 200 B.R. 568, 575 (E.D.Pa. 1996). In addition, if the bankruptcy court is being used as a forum to resolve what is essentially a two-party dispute, this factor may also be considered in deciding whether to apply § 305(a). *Id.* (citations omitted). However, the exact factors and the weight to be given each of them is "highly sensitive to the facts of each individual case." *Id.* Our review of the relevant factors in this case convinces us that dismissal is also appropriate under § 305(a).

As already discussed at length, this bankruptcy case is in essence a two-party partnership dispute that implicates purely state law issues. As concluded above, there is no need for federal court to resolve this dispute; rather, the proper course is to remand it to the State Court. *See In re Mazzocone,* 183 B.R. 402, 421 (Bankr.E.D.Pa.1995) ("[b]ecause a bankruptcy forum is often not the proper forum in which to adjudicate non-bankruptcy issues, litigation of such issues is frequently best left to the state courts and should not be imposed upon this specialty court unless necessary to resolve a bankruptcy-centered dispute"; "bankruptcy courts

---

**28.** C. Spencer could insist that any future loan be approved by all partners in the partnership, including Steinman. If the loan is in the best-

interest of the partnership, presumably Steinman would consent as he did with the recent loan presented for Court approval.

have resorted to § 305(a) when they have determined that they are not the proper forum to decide ... partnership disputes."), *aff'd*, 200 B.R. 568 (E.D.Pa.1996); *In re Silver Spring Center*, 177 B.R. 759 (Bankr. D.R.I.1995) (abstention under § 305(a) granted where bankruptcy involved a classic two party dispute involving solely state law issues that were pending before the state court); *Monsour Medical Center, Inc. v. Stein (In re Monsour Medical Center, Inc.)*, *supra*, 154 B.R. at 207 ("Dismissal pursuant to section 305 is especially appropriate when another forum is available to determine the parties' intent and an action has been commenced in that forum."); *In re Fax Station, Inc.*, 118 B.R. 176 (Bankr.D.R.I.1990) (dismissal under § 305(a) appropriate where petitioners were seeking to use bankruptcy court as an alternate approach to state proceedings to resolve intra-company management and stockholder problems and not for the purpose of obtaining an orderly distribution of creditor claims); *In re Business Information Company, Inc.*, *supra*, 81 B.R. at 387 (noting that courts have held that abstention is appropriate under § 305(a) when another forum is available to determine the parties' interests, and in fact such an action has been commenced).

Furthermore, while contentions have been made that defendants were not being treated fairly in State Court, Congress did not create the bankruptcy courts to remedy such situations or to provide an alternative forum when such contentions are raised. It is obvious that Debtors did not need to file bankruptcy because of financial concerns. Their filings appear to be a vehicle which defendants and their attorneys utilized to get the Steinman Litigation out of State Court. *See In re Heritage Wood 'N Lakes Estates, Inc.*, 73 B.R. 511, 514 (Bankr.M.D.Fla.1987) (bankruptcy case dismissed where forum shopping had occurred; court noted that "Debtor, for reasons best known to itself and perhaps the strategy of counsel, determined that it was not going to get the best side of the coin in the state court and looked to go elsewhere to have a new bite at the apple.").

It is also apparent that Debtors would incur needless additional expenses if their bankruptcy case proceeds. In this Court, Debtors need to be represented by specialized bankruptcy counsel. A plan and disclosure statement would be required with the costs attendant thereto. In the short period of time between Debtors' filings in May and July 31, 1996, the fees of their bankruptcy counsel have amounted to over $65,000.[29] In addition to their attorneys' fees, Debtors would also be forced to incur the fees which they are obligated to pay to the U.S. Trustee. This factor weighs in favor of dismissal under § 305(a). *See In re Realty Trust Corporation*, 143 B.R. 920, 929 (N. Mariana Islands 1992) (extreme expense of administering case in bankruptcy because of additional legal fees that would be involved in hiring specialized bankruptcy counsel is a factor counseling dismissal of the case pursuant to § 305(a)); *In re Walters*, *supra*, 108 B.R. at 251 (reasoning that debtor did not need a "staff of bankruptcy lawyers (and the high cost associated with retaining specialty counsel) to assist them in preparing a loan application in order to refinance the note on its property, which would be only method of reorganizing); *In re Business Information Company, Inc.*, *supra*, 81 B.R. at 387 (noting that bankruptcy petition already cost the Debtor $10,000 in legal fees and that substantially larger fees would be requested if the bankruptcy remained).

Finally, it would be inefficient to have this Court utilize its resources to administer Debtors' bankruptcy case since there is no reorganization purpose being served by it. The case has few creditors. Indeed, aside from the Rosen Firm's claim and the disputed Steinman claim, Phoenix's unsecured debt totals less than $16,000.00. The reason for this small amount of unsecured debt is that Phoenix was paying its debts as they became due prior to the bankruptcy. With the rent from the fourth floor tenant, it will be in a position to continue doing so until at least the spring of next year. This factor merits significant consideration in the decision whether to abstain under § 305(a). *In re Business Information Company, Inc.*, *supra*, 81 B.R. at 387 (noting that "a significant number of courts have stated that economy and efficien-

---

**29.** Presumably no insignificant part of these fees relate to the Remand Motion and the prior Application to Employ the Rosen Firm, both of which were a result of this bankruptcy filing.

cy of administration must be key considerations in the abstention decision" under § 305(a)"). Based on these factors, dismissal of this bankruptcy case under § 305(a) is also warranted.

### III. *CONCLUSION*

Steinman's Motion for Remand is granted pursuant to § 1334(c)(1) and the above-captioned adversary proceeding is remanded to State Court. Moreover, under the circumstances of this case, dismissal under § 1112(b) and/or § 305(a) is proper and this bankruptcy case is dismissed in its entirety. With regard to the Federal Action, since it was referred to this Court by the District Court pursuant to its Order dated August 20, 1996, based upon the "Standing Orders of [the district court] regarding referral of related cases," and this bankruptcy case is hereby dismissed, a recommendation will be made to the District Court that the reference be withdrawn.

An Order consistent with this Memorandum Opinion will be entered.