In re Robert A. SPADE,
Alleged Debtor.

No. 00 11002 DEC.

United States Bankruptcy Court,
D. Colorado.

Jan. 22, 2001.

Dennis A. Graham, James T. Markus, Victor M. Morales, Curt Todd, Haligman and Lottner, P.C., Denver, CO, for creditors.

Peter C. Houtsma, Jack L. Smith, Denver, CO, for debtor.

## ORDER ON REMAND REGARDING ORDER TO ABSTAIN PURSUANT TO 11 U.S.C. § 305

DONALD E. CORDOVA, Bankruptcy Judge.

On November 16, 2000, the Honorable John L. Kane, Jr., Senior U.S. District

Judge, reversed and remanded this Court's June 26, 2000 decision to dismiss, pursuant to the abstention provision set forth in 11 U.S.C. § 305(a), this involuntary Chapter 7 petition filed against the alleged Debtor, Robert A. Spade. *See In re Spade*, 255 B.R. 329 (D.Colo.2000). Judge Kane reversed this Court's order on the grounds that this Court had made insufficient findings of fact to support a decision to abstain under 11 U.S.C. § 305(a). *See id.* at 332–333. Furthermore, Judge Kane signaled that this Court should consider applying a "strict construction" of 11 U.S.C. § 305 as illustrated in the case of *In re RAI Marketing Serv., Inc.*, 20 B.R. 943 (Bankr.D.Kan.1982). *See id.* at 331. The case was remanded to this Court for specific findings and conclusions explicating this Court's exercise of discretion under 11 U.S.C. § 305(a). *See id.* at 333. After considering the issues raised in Judge Kane's opinion and reevaluating the evidence in the context of the legal standards governing abstention under 11 U.S.C. § 305(a) [1], the Court, again, exercises the discretion afforded to it by § 305(a), and abstains from exercising jurisdiction over this purely state law debt-collection case. Accordingly, the Court dismisses the involuntary petition.

### FACTS

This involuntary petition was filed naming Robert A. Spade as the alleged Debtor. The Petition was filed under 11 U.S.C. § 303 by the ProFutures Special Equities Fund, L.P., Gary Schlessman, and Lee E. Schlessman, and was later joined by Cal and Amanda Rickel (collectively, the "Petitioning Creditors"). They allege that the are owed various sums of money by Communications Systems International, Inc.

("CSI"), and that these sums were personally guaranteed by the alleged Debtor. Their claims total approximately $3 million.

The alleged Debtor filed his Answer on February 28, 2000, in which he denied all of the allegations of the Involuntary Petition. As defenses to the Petition, he asserted that the prerequisites of 11 U.S.C. § 303 had not been met, that the debts allegedly owing to the Petitioning Creditors were contingent or the subject of a *bona fide* dispute, and that there was no proof that the Debtor was not generally paying his debts as they became due. The alleged Debtor also moved this Court to abstain under 11 U.S.C. § 305 on the basis that he was a party to two state district court cases pending in El Paso County, Colorado, involving the same debts and the same parties that filed this petition.

The matter was tried to the Court on June 15, 2000 following which the Court entered a written order on June 26, 2000. *See Order Re Involuntary Petition and Dismissal of Involuntary Petition,* Case No. 00–11002 DEC, June 26, 2000 (*"Order"*). The Court's Order set forth the salient background facts from which the present dispute precipitated:

> From 1993 through 1999, Mr. Spade was at various times an officer, director, CEO, and chairman of the board of CSI. He also owned a substantial percentage of CSI's common stock. In December, 1997, CSI borrowed $2,840,000 from a group of investors through a private placement memorandum. A total of seventeen (17) investors were in this group, including the four petitioning creditors. ProFutures loaned $1,050,000; Lee Schlessman loaned

---

1. Following the entry of Judge Kane's order, this Court conducted a status conference with the parties on December 7, 2000 at which the Court advised the parties that it would not take further evidence on the § 305 abstention issue, but would reconsider the issue, reevaluate the facts, and enter an appropriate order consistent with Judge Kane's order based upon the existing record. To assist the Court's determination of the this issue, the Court requested briefs from both parties addressing the legal standards to be applied and the evidence that should be considered by the Court in determining the § 305 abstention issue. Both parties filed briefs in support of their respective positions. The Court has carefully considered the arguments presented by the parties in consideration of this issue.

$200,000; Gary Schlessman loaned $100,000; and the Rickels loaned $100,000. Each investor received a convertible promissory note from CSI with a limited guaranty from the debtor, up to an aggregate of $750,000 of the total amount CSI borrowed under the Private Placement Memorandum. (Exhibit 1). These 1997 promissory notes matured on December 30, 1998.

ProFutures lent an additional $1,750,000 to CSI on May 7, 1998 and on July 20, 1998, referenced by two promissory notes. (Exhibit 2). The May note was for $1,250,000 and matured on May 7, 1999. The July note was for $500,000 and matured on October 1, 1999. The debtor and Patrick Scanlon executed a limited guaranty on these notes on May 7, 1998 in favor of ProFutures in the aggregate principal amount of up to $2 million. (Exhibit 2).

It is undisputed that the 1997 and 1998 notes have matured and have not been paid by CSI or by the guarantors. In fact, CSI filed a petition in bankruptcy on October 27, 1999. [Case No. 99–23460 CEM] (Exhibit 16). Mr. Spade signed the bankruptcy petition as CEO for CSI, and as the person authorized to file the petition on behalf of CSI. He listed the 1997 notes as undisputed, non-contingent CSI debts in CSI's schedules, but omitted the debt arising out of the 1998 notes. None of the petitioning creditors has filed suit or obtained a judgment against CSI.

In August, 1999, Pro Futures filed a lawsuit in the state court against Mr. Spade and Patrick R. Scanlon to collect on the guaranty on the 1998 notes. Mr. Spade moved to dismiss the complaint, asserting that his liability on the 1998 debt was subordinated to senior unpaid debt, the payment of the 1997 debt, and thus the notes were not yet due and owing. (Exhibit 13). The state court denied the motion, holding that the debtor's liability on his guaranty was not contingent upon CSI's payment of its other debt. (Exhibit 15). The debtor also contended in his motion to dismiss that the holders of the 1997 notes were indispensable parties and should be joined in the law suit. He asserted, by sworn affidavit, that he did not have sufficient assets to satisfy all of the obligations under his limited guaranties. He alleged that the resolution of the case without the joinder of the 1997 note holders could destroy their right to payment because of his lack of resources. (Exhibit 13).

On or about January 12, 2000, Mr. Spade and his wife filed a declaratory judgment action against the 1997 and 1998 note holders, seeking a determination that the transfer of assets he made to his wife were not fraudulent. That case is presently pending in El Paso County District Court. The defendants have not filed an Answer to the complaint, but instead filed the involuntary petition against the debtor.

*Order,* p. 2.

After analyzing the Petitioning Creditors' claim under 11 U.S.C. § 303 and the alleged Debtor's defenses, the Court found that the Petitioning Creditors had met their burden by showing that Spade's debts to them had matured and had not been paid. The Court rejected Spade's argument that the claims were contingent as to liability, finding the pendency of state court litigation insufficient, by itself, to establish under an objective test that the Petitioning Creditors' claims were either contingent or the subject of a *bona fide* dispute. *See Order,* pp. 3–6.

Although the Court determined that the Petitioning Creditors had established the requirements of § 303(b), the Court elected to exercise its discretion, pursuant to 11 U.S.C. § 305(a), to abstain from exercising jurisdiction over this case. *See Order,* p. 7. The Court's decision to abstain relied primarily upon a common interpretation of § 305 as was used by Judge Clark in *In re Tarletz,* 27 B.R. 787, 793 (Bankr.D.Colo. 1983) ("[i]n considering dismissal under

Section 305, it is appropriate to consider the motivation of the petitioners, whether the bankruptcy court or the state court can better serve the interests of the creditors and the detriment of the bankruptcy proceedings to the debtor."). The Court supported its decision to abstain as follows:

> The court agrees with the debtor's characterization of the state court litigation as essentially a "collection case." The allegations that debtor may have transferred assets to his wife to defraud creditors were made after the collection case was filed. The state court is quite capable of conducting the trial and managing the discovery on the collection case and the subsequent suit brought by the debtor and his wife against the investors. The issues are state law matters and within the state court's jurisdiction. The petitioning creditors presented no evidence to show that these claims could not be heard as expeditiously in state court as in the bankruptcy court. Additionally, clearly there is a detriment to a debtor being dragged into the bankruptcy court especially when there is an alternative forum as there is in this case. A social stigma attaches to a person who is a debtor in the bankruptcy court, especially when it is not a voluntary act. The court finds that the interests of the debtor and the petitioning creditors will be better served by dismissing this case.

*Order,* p. 7.

## DISCUSSION

### I. Strict versus Broad Interpretation of § 305

█ Section 305 of the Bankruptcy Code grants bankruptcy courts the authority to abstain from exercising its jurisdiction in certain circumstances. It provides as follows:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

> (1) the interests of the creditors and the debtor would be better served by such a dismissal or suspension. . . .

11 U.S.C. § 305.

█ At issue in this case is the scope and breadth of the bankruptcy court's discretion to dismiss or suspend proceedings under § 305. As noted in Judge Kane's order of remand, courts have followed different interpretations of the scope of a bankruptcy court's authority under § 305. Some courts, like that in *In re RAI Marketing Serv., Inc.,* 20 B.R. 943 (Bankr. D.Kan.1982), construe the § 305 abstention very narrowly as affording courts the ability to abstain only when the specific factors mentioned in the statutes's legislative history are present in a case. Other courts, like that in *In re Tarletz,* 27 B.R. 787 (Bankr.D.Colo.1983), view § 305 as allowing bankruptcy courts to use their discretion in evaluating a wide range of factors beyond those in the legislative history in deciding whether it is appropriate to abstain under § 305. As recognized by Judge Kane, however, there is an overarching principle in the § 305 analysis that, before a court may abstain from exercising jurisdiction over an otherwise proper case, the court must make specific and substantiated findings that the interests of the creditors and the debtor will be better served by dismissal or suspension. *See In re Spade,* 255 B.R. at 332. The question in this case is whether, in making this determination, the Court is limited to the consideration of the factors set forth in the provision's legislative history as suggested by the narrow interpretation embodied in *RAI, supra,* or whether the Court may consult factors beyond those mentioned in the legislative history as was done by Judge Clark in *Tarletz, supra.* To fully appreciate the basis for this Court's decision to follow one interpretation over the other, it is appropriate to explain the two cases that represent these differing interpretations.

In *RAI,* a corporate debtor moved to dismiss or suspend the involuntary petition filed against it pursuant to § 305(a)(1). Notwithstanding the plain language of the statute, the bankruptcy court formulated its own rule that abstention under § 305 is appropriate:

> *only if each and every one of the following factors exist:*
>
> 1. The petition was filed by a few recalcitrant creditors and most creditors oppose bankruptcy;
>
> 2. There is a state insolvency proceeding or other equitable and concrete out-of-court arrangement pending; and
>
> 3. Dismissal or suspension is in the best interests of the debtor and all creditors.

*In re RAI,* 20 B.R. at 946 (emphasis added).

Influencing the court's decision to adopt what it referred to as its "strict" interpretation of § 305 was the court's loyalty to "the general rule that courts should exercise jurisdiction when properly invoked," *id.* at 945, and its concern that "abstention order[s][are] not appealable." *Id.* In formulating its standard for § 305, the court took particular notice of the statute's legislative history, quoting the following language from the Senate Judiciary Committee's Notes relating to this provision:

> A principle of the common law requires a court with jurisdiction over a particular matter to take jurisdiction. This section recognizes that there are cases in which it would be appropriate for the court to decline jurisdiction.... Thus, the court is permitted, if the interests of creditors and the debtor would be better served by dismissal of the case or suspension of all proceedings in the case, to so order. The court may dismiss or suspend under the first paragraph, for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has

been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case....

*Id.* (citing S.Rep. No. 989, 95th Cong., 2d Sess., 35–36 *reprinted in* 1978 U.S.C.C.A.N. 5787, 5821–22, *quoting* H.R.Rep. No. 595, 95th Cong., 1st Sess., 325 (1977) *reprinted in* 1978 U.S.C.C.A.N. 5787, 6281). Observing that five other courts had "uniformly required the existence of every factor mentioned in the legislative history as a prerequisite to dismissal or suspension," *id.* (citations omitted), the *RAI* court persuaded itself that a court could abstain under § 305 *only if* the factors mention in the Senate report were satisfied. *See id.*

The opinion in *Tarletz* showcases the other, less restrictive interpretation which suggests that courts may properly consider a much wider range of factors when presented with a motion to abstain under § 305. *Tarletz,* which was decided after *RAI,* involved an individual debtor who moved pursuant to § 305 for the dismissal of an involuntary petition filed against him. *See In re Tarletz,* 27 B.R. at 793 n. 1. Like *RAI,* the court acknowledged the legislative history of the provision by paraphrasing the Committee's report in the following manner: "The legislative history states that the court may dismiss if out-of-court arrangements are being worked out which are not prejudicial to the creditors and the case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment." *Id.* at 793 (citation omitted). While the court found this history to be informative, it did not consider it to be conclusive of the situations in which courts should suspend or dismiss under § 305:

> The example set forth in the legislative history *is not intended to be inclusive.* In considering dismissal under Section 305, it is appropriate to consider

the motivation of the petitioners, whether the bankruptcy court or the state court can better serve the interests of the creditors, and the detriment of the bankruptcy proceeding to the debtor.

*Id.* (emphasis added).

Relying on its view that § 305 affords bankruptcy courts the authority to consult factors beyond those noted in the Committee report, the *Tarletz* court dismissed the case on grounds other than that set forth in the legislative history of § 305 and *RAI.* The *Tarletz* court's determination that the interests of creditors and the debtor would be better served by dismissal turned on the court's consideration of the following factors: 1) the motivation of the petitioning creditors, 2) whether the bankruptcy court or the state court can better serve the interests of the creditors, and 3) the detriment of the bankruptcy proceeding to the debtor. *See id.*

Unlike *RAI,* the *Tarletz* court did not proclaim that a particular set of circumstances must exist before the court would abstain under § 305. Rather, the *Tarletz* court identified the three factors it determined to be relevant and useful in its determination of whether dismissal would better serve the interests of the creditors and the debtor. Importantly, the court did not suggest that the three factors referenced in its opinion were the *only* three factors to be used in evaluating § 305 motions, nor did the court suggest that the same factors would be relevant in *every* case. Moreover, the court did not specify precisely how to weigh the import of each factor *vis-a-vis* other factors. The *Tarletz* court used the factors in its opinion as a tool to illustrate how the court applied its discretion in reaching its decision to abstain in that case. Unlike *RAI,* the court's opinion does not, however, demarcate the *sole* pathway to a § 305 dismissal. The *Tarletz* opinion, therefore, embodies a much broader interpretation of § 305 than that in *RAI.*

In this case, the Petitioning Creditors urge the Court to follow the narrow interpretation applied in *RAI,* whereas the alleged Debtor promotes the broader approach applied in *Tarletz.* The Petitioning Creditors gained an influential ally in Judge Kane who expressed his attraction to the restricted interpretation used in the *RAI* case.[2] *See In re Spade,* 255 B.R. at 331 ("In accordance with the general rule that courts should exercise jurisdiction when properly invoked, and given Congress's declaration that abstention orders under § 305 are unreviewable beyond the federal trial court level, I agree with others who have considered the issue that § 305 should be strictly construed.") (citation and footnote omitted).

▮▮▮▮ After reviewing both approaches, the Court is persuaded that the broader approach applied in *Tarletz* is more sound than the strict interpretation championed in *RAI* for two reasons. First, *RAI* 's strict interpretation is predicated upon a defective statutory construction of § 305. Specifically, the *RAI* court's strict interpretation unjustifiably alters the standard governing abstention that is set forth in the plain language of the statute. A court's primary task in interpreting statutes is "to determine congressional intent, using 'traditional tools of statutory construction.'" *St. Charles Investment Co. v. Commissioner of Internal Revenue,* 232 F.3d 773, 776 (10th Cir.2000) (quoting *NLRB v. United Food & Commercial*

---

**2.** The Petitioning Creditors assert that this Court must follow the interpretation of § 305 as expressed in the *RAI* case as it represents the law of the case. *See Brief of Petitioning Creditors,* p. 6. They contend that Judge Kane "determined" that § 305 should be strictly construed as it was in *RAI. See id.* The Court agrees with the alleged Debtor, however, that Judge Kane's order did not

specifically overrule *Tarletz* or the interpretation of § 305 applied therein, nor did it mandate the application of *RAI's* interpretation in this case. Judge Kane concluded that this Court had made insufficient findings under either interpretation and reversed this Court's previous order on that basis alone. *See In re Spade,* 255 B.R. at 332–33.

*Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987)). The Tenth Circuit recently described the process of statutory construction as follows:

As in all cases requiring statutory construction, "we begin with the plain language of the law." *United States v. Morgan,* 922 F.2d 1495, 1496 (10th Cir. 1991). In so doing, we will assume that Congress's intent is expressed correctly in the ordinary meaning of the words it employs. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Therefore, "[i]t is a well established law of statutory construction that, absent ambiguity or irrational result, the literal language of a statute controls." *Edwards v. Valdez,* 789 F.2d 1477, 1481 (10th Cir.1986). Where the language of the statute is plain, it is improper for this Court to consult legislative history in determining congressional intent. *United States v. Richards,* 583 F.2d 491, 495 (10th Cir.1978). Furthermore, legislative history may not be used to create ambiguity in the statutory language. *Id.* Our role in construing statutes was summarized by Justice Holmes: " 'We do not inquire what the legislature meant; we ask only what the statute means.' " *Edwards,* 789 F.2d at 1481 n. 7 (quoting OLIVER WENDELL HOLMES, COLLECTED LEGAL PAPERS 207 (1920).

*St. Charles Investment Co. v. Commissioner of Internal Revenue,* 232 F.3d. at 776.

■ The language enacted by Congress in § 305 is rather simple: the court, after notice and a hearing, may dismiss or suspend a case under this title if the interests of the creditors and the debtors would be better served by such dismissal or suspension. *See* 11 U.S.C. § 305(a)(1). It is true that certain elements of this provision are not specifically defined. For example, the provision offers no guidance as to what "interests of the creditors and the debtor" might include, nor does it specify the situa-

tions in which these interests would be "better served" by dismissal or suspension. Nevertheless, the rules of statutory construction prohibit a court from abandoning the plain language of § 305 unless it makes a determination that the statute is ambiguous. *See id.* Words or phrases that are not specifically defined in a statute are not ambiguous *per se.* Congress routinely drafts provisions with broad language as a means of delegating discretion to those obligated to act under the provision. Thus, under the guidelines of statutory construction, it would be improper for a court to forsake the plain language of § 305 and consult the provision's legislative history unless it determines the provision to be sufficiently ambiguous to warrant such an investigation. *See id.*

The *RAI* court did not follow these fundamental principles of statutory construction in formulating the strict interpretation of § 305. For reasons left unexplained, the court bypassed the plain language of the statute and proceeded, without any hesitation or reflection, to extract what it perceived to be Congress' true intent in enacting this provision. *See In re RAI,* 20 B.R. at 945. Importantly, the court never made any determination that the language of § 305 was sufficiently ambiguous to justify its venture into the interpretation of legislative intent. Based on its reading of the Committee's report, the court ultimately concluded that Congress had intended for courts to abstain under § 305 only when the facts of the case satisfied the three factors set forth in the example recounted in the Committee's report. *See id.* at 946. From this, the court declared that each factor contained in the Committee's example must be present before a court could abstain under § 305. *See id.* Thus, in addition to the standard set out in the plain language of § 305, the *RAI* court's strict interpretation requires movants to establish the following additional elements before a the court may dismiss a case under § 305:

1) That the petition was filed by a few recalcitrant[3] creditors;

2) That most creditors oppose bankruptcy; and

3) That there is a state insolvency proceeding or other equitable and concrete out-of-court arrangement pending.

*See id.* The plain text of § 305, however, does not require the court to make these additional findings before it may exercise its discretion to abstain under this provision. The *RAI* court's construction of the statute has had the consequence of imposing a far different standard for abstention than was originally enacted by Congress. The *RAI* court neither recognizes this fact nor offers any justification for its imposition of these additional requirements. The only requirement that must be met is expressed in the plain language of the provision. Thus, this Court agrees that "[h]ad Congress intended the illustrative example in the legislative history to limit the factual scenarios under which abstention is authorized, it would have included such language in § 305(a) itself." *In re 801 South Wells Street Limited Partnership*, 192 B.R. 718, 723 (Bankr.N.D.Ill.1996).

The *RAI* court's redrafting of this provision cannot be justified under the theory that the legislative history of the provision clearly indicates that Congress intended this provision to apply narrowly.[4] The Senate report does not designate the one example it cites to be the *only* situation in which Congress intended for courts to act

under § 305. *Accord, In re Whitby*, 51 B.R. 184, 186–87 (Bankr.E.D.Mich.1985) ("the legislative history was clearly intended to be illustrative rather than restrictive; if Congress had intended to limit dismissal and suspension to involuntary cases in which the enumerated factors are found, it could have easily have done so."). Ironically, even the *RAI* court acknowledged this point, noting that "the legislative history does not define the scope of § 305, [but] it is somewhat illustrative." *In re RAI*, 20 B.R. 943 at 945; *see also In re Spade*, 255 B.R. at 331. In the absence of clear congressional intent to the contrary, the language in § 305 must be applied, not interpreted or modified. The statutory construction supporting the narrow interpretation of § 305 embodied in cases like *RAI* is defective as it is inconsistent with traditional principles of statutory construction.

The second reason this Court elects to follow the *Tarletz* view of § 305 is the overwhelming support this interpretation has been given by cases applying § 305. As Judge Kane recognized, there exists a spectrum of opinion among the courts that have applied § 305 regarding the scope of the court's discretion in acting under § 305. *See In re Spade*, 255 B.R. at 332. From this Court's survey, its appears that the *RAI* court's interpretation demarcates the most extreme end of the § 305 spectrum given its view that abstention is appropriate only in those circumstances that match the example provided in the legisla-

---

**3.** The use of the word "recalcitrant" may imply that the movant must satisfy a certain *intent* element before the court may abstain.

**4.** The legislative history of § 305 is an untrustworthy indicator of Congress' intent regarding the scope of a court's discretion in § 305 matters as courts have interpreted the Committee's report differently. At least two courts interpret the statute's legislative history to mean that Congress meant to enhance the court's authority to abstain rather than to dilute it. In *Swift v. Bellucci (In re Bellucci)*, 119 B.R. 763 (Bankr.E.D.Cal.1990) n. 18, the court noted that § 305's "[l]egislative history clarifies that Congress was deliberately reject-

ing the general rule that courts with jurisdiction over a matter must take jurisdiction." The Court in *In re Fast Food Properties, Ltd. # 1*, 5 B.R. 539, 540 (Bankr.C.D.Cal.1980) commented that the enactment of the Bankruptcy Reform Act of 1978 and § 305 suggests that Congress meant to enlarge the court's power to abstain rather than impose restrictions on this power. *See also In re Colonial Ford, Inc.*, 24 B.R. 1014, 1021 (Bankr.D.Utah 1982) ("Congress intended the court to exercise considerable discretion in sifting and weighing grounds for dismissal under [§] 305(a)(1).").

tive history. This Court has found only *two* other case that actually follow the strict rule pronounced by *RAI*. *See In re Sherwood Enterprises, Inc.*, 112 B.R. 165 (Bankr.S.D.Tex.1989) (following three factor test espoused in *RAI* without discussion or reconciliation with the plain language of § 305); *see also In re Martin–Trigona*, 35 B.R. 596 (Bankr.S.D.N.Y.1983) (citing the three factor test of *RAI* and limiting the application of § 305 to cases that reflect the characteristics of the specific example mentioned in the Committee report).

To be sure, there are number of courts that approach dismissal under § 305 very conservatively given the fact that such abstention orders are not subject to review by the circuit courts of appeal, however none of these cases actually subscribe to *RAI's* rigorous requirements for abstention. *See, e.g., In re Nina Merchandise Corp.*, 5 B.R. 743 (Bankr.S.D.N.Y.1980) (denying abstention under § 305 after applying a "cost-benefits" test to bankruptcy versus state court jurisdiction); *In re Luftek*, 6 B.R. 539 (Bankr.E.D.N.Y.1980) (abstaining under § 305 after noting that all of the factors identified in the legislative history were present, but cautioning, in *dicta*, that dismissals under § 305 should be the exception and not the rule); *In re G–N Partners*, 48 B.R. 459 (Bankr. D.Minn.1985) (denying abstention under § 305, but expressly noting that there may be other situations beyond that identified by the legislative history in which dismissal under § 305 would be appropriate); *In re Trina Assoc.*, 128 B.R. 858 (Bankr. E.D.N.Y.1991) (abstaining under § 305 finding the *RAI* factors to be present, but recognizing, without criticism, that other courts consider a wide variety of criteria in determining whether to abstain); *In re Grigoli*, 151 B.R. 314 (Bankr.E.D.N.Y. 1993) (denying abstention under § 305 after considering *RAI's* three factor test, but accepting that other courts use a variety of factors in determining whether to abstain). While these courts are very reluctant to

abstain, they do not fully adhere to the *RAI* court's strict interpretation of § 305.

*Tarletz* and the vast majority of cases applying § 305, however, occupy the other, more liberal end of the spectrum. Viewing their discretion to be more broad under § 305, these courts routinely use a wide variety of factors to evaluate the question of whether dismissal would better serve the interests of the creditors and the debtor. *See, e.g., In re Jr. Food Mart of Arkansas, Inc.*, 241 B.R. 423 (Bankr. E.D.Ark.1999); *In re Argus Group 1700, Inc.*, 206 B.R. 737 (Bankr.E.D.Pa.1996); *In re Mazzocone*, 200 B.R. 568 (E.D.Pa. 1996) ("[C]ourts have generally found consideration of such factors to be appropriate when deciding whether to apply § 305(a)"); *In re 801 South Wells L.P.*, 192 B.R. 718 (Bankr.N.D.Ill.1996); *In re Rookery Bay, Ltd.*, 190 B.R. 949 (Bankr.M.D.Fla.1995); *In re Ethanol Pacific, Inc.*, 166 B.R. 928 (Bankr.D.Idaho 1994); *In re ABQ–MCB Joint Venture*, 153 B.R. 338 (Bankr. D.N.M.1993); *In re Realty Trust Corp.*, 143 B.R. 920 (D.N.Mariana Islands 1992); *In re Wine and Spirits Specialties of Kansas City, Inc.*, 142 B.R. 345 (Bankr. W.D.Mo.1992); *In re Westerleigh Development Corp.*, 141 B.R. 38 (Bankr.S.D.N.Y. 1992); *In re Iowa Trust*, 135 B.R. 615 (Bankr.N.D.Iowa 1992); *In re Axl Industries, Inc.*, 127 B.R. 482 (S.D.Fla.1991), *aff'd*, 977 F.2d 598 (11th Cir.1992); *In re Fax Station, Inc.*, 118 B.R. 176 (Bankr. D.R.I.1990); *In re Williamsburg Suites, Ltd.*, 117 B.R. 216 (Bankr.E.D.Va.1990); *In re First Financial Enterprises, Inc.*, 99 B.R. 751 (Bankr.W.D.Tex.1989); *In re Business Information Company, Inc.*, 81 B.R. 382 (Bankr.W.D.Pa.1988); *In re Heritage Wood 'N Lakes Estates, Inc.*, 73 B.R. 511 (Bankr.M.D.Fla.1987); *In re Deacon Plastics Machine, Inc.*, 49 B.R. 982 (Bankr.D.Mass.1985); *In re Beacon Reef L.P.*, 43 B.R. 644 (Bankr.S.D.Fla.1984); *In re Fitzgerald Group*, 38 B.R. 16 (Bankr. S.D.N.Y.1983); *In re Tarletz*, 27 B.R. 787 (Bankr.D.Colo.1983); *In re Artists' Outlet, Inc.*, 25 B.R. 231 (Bankr.D.Mass.1982); *In re Win–Sum Sports, Inc.*, 14 B.R. 389

(Bankr.D.Conn.1981); *In re Michael S. Starbuck, Inc.,* 14 B.R. 134 (Bankr. S.D.N.Y.1981); *In re SBA Factors of Miami, Inc.,* 13 B.R. 99 (Bankr.S.D.Fla.1981); *In re R.V. Seating, Inc.,* 8 B.R. 663 (Bankr.S.D.Fla.1981); *In re Nar-Jor Enterprises Corp.,* 6 B.R. 584 (Bankr.S.D.Fla. 1980); *In re Sun World Broadcasters, Inc.,* 5 B.R. 719 (Bankr.M.D.Fla.1980); *In re 7H Land & Cattle Co.,* 6 B.R. 29 (Bankr.D.Nev.1980). Clearly, the historical and contemporary trend in § 305 case law permits courts to consider a wide variety of factors relevant to the facts of the particular case in determining whether to abstain under § 305.

 In sum, by creating a new rule that a court may abstain under § 305 only when the circumstances parallel those set forth in the statute's legislative history, the *RAI* court and the so called "strict interpretation" of § 305 improperly divests the bankruptcy court of the discretion specifically delegated to it by Congress. The discretion afforded in § 305 is not so limited, however. *Accord, In re Realty Trust Corp.,* 143 B.R. at 926. While it is true that a court has a duty to exercise its jurisdiction when properly invoked, it is also true that courts have a duty to exercise their discretion when the circumstances so warrant. *Cf. Will v. Calvert Fire Ins. Co.,* 437 U.S. 655, 662–63, 98 S.Ct. 2552, 57 L.Ed.2d 504 (noting the "well settled" principle that a federal court with jurisdiction over a matter is under no compulsion to exercise that jurisdiction where the controversy may be settled more expeditiously in the state court; and that such a decision is largely committed to the carefully considered judgment of the court). Indeed, it may be an abuse of discretion to apply the overly strict interpretation of § 305 as the court may be imposing limits on the statute that simply do not exist. For these reasons, this Court rejects the *RAI* court's strict interpretation of § 305 and holds that the broad interpretation of § 305 as embodied in *Tarletz* and the majority of the case law

presents the correct approach in determining whether to abstain under § 305. In exercising the discretion afforded by § 305, a court may consider any factors it considers to be relevant to the determination of whether a dismissal of the case or a suspension of all proceedings would better serve the interests of the creditors and the debtor. *See* 11 U.S.C. § 305.

## II. Factors to be Considered in this Case

 In determining whether dismissal under § 305 is appropriate, courts must look to the individual facts of each case. *See In re Trina Assoc.,* 128 B.R. 858, 867 (Bankr.E.D.N.Y.1991). Courts applying the broad interpretation of § 305 have considered a number of different criteria to determine whether a case should be dismissed under this section, including, but not limited to:

(1) the motivation of the parties seeking bankruptcy jurisdiction;

(2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3) the economy and efficiency of administration;

(4) the prejudice to the parties;

*See In re Fax Station, Inc.,* 118 B.R. at 177 (and cases cited therein); *In re Tarletz,* 27 B.R. at 793; *In re Realty Trust Corp.,* 143 B.R. at 926. The above factors are particularly relevant to the facts presented in this case and warrant separate discussion.

### A. Motivation of the Parties Seeking Bankruptcy Jurisdiction

In considering dismissal under § 305, it is appropriate to consider the motivation of the parties in seeking jurisdiction of the bankruptcy court. *See In re Tarletz,* 27 B.R. at 793; *In re Argus Group 1700, Inc.,* 206 B.R. at 756; *In re Heritage Wood 'N Lakes Estates, Inc.,* 73 B.R. at 514 (dismissing case under § 305 where court determined that forum shopping had oc-

curred). Although the motivation of the parties may not directly affect the consideration of whether the creditors and the debtor would be better served by the dismissal of this case, the motives of the parties can significantly influence the Court's evaluation of other factors and contribute to the Court's decision to dismiss under § 305.

In this case, the Petitioning Creditors claim that they filed this petition so that an independent trustee could examine Spade's affairs and recover preferences and fraudulent transfers for the benefit of all Spade's creditors. Spade, however, contends that the Petitioning Creditors' petition is motivated by a desire to forum shop as well as a desire to shift costs of litigating their state court collections case against Spade to a bankruptcy trustee, other creditors, and the ultimately Spade himself. The events leading up to the filing of the petition as well as the testimony of ProFutures' representative are helpful in assessing the motives of the Petitioning Creditors in filing the petition and should be discussed in more detail.

As recounted above, the primary Petitioning Creditor in this case, ProFutures, initiated a lawsuit against Spade in the El Paso County District Court, Colorado, seeking to collect on Spade's guaranty of several notes CSI had issued to ProFutures. Although it held both 1997 and 1998 notes, ProFutures developed a collection and litigation strategy to sue Spade only on its 1998 notes. ProFutures' representative explained that it was the only party that held 1998 notes and that suing on the 1998 note allowed ProFutures to avoid the difficulty of coordinating litigation with the other sixteen parties that held 1997 notes. Furthermore, this strategy allowed ProFutures to avoid the possibility of sharing any recovery of Spade's limited guaranty with the other note holders. See Transcript of Trial, June 15, 2000, 42:4–44:10 and 71:5–75:23. ProFutures' representative further testified that it followed this strategy because it was not

worth the effort to coordinate among the other note holders to collect only a small piece of a guarantee limited to $750,000. See id. Thus, according to ProFutures' representative, the strategy to sue on the 1998 note rather than on the 1997 note was designed to collect the maximum amount from Spade notwithstanding the claims of the other note holders. Based upon this admitted strategy, it is clear that ProFutures conceived of its lawsuit as a collection action from the very beginning and designed its collection strategy to avoid any interference from the other note holders.

ProFutures' strategy to avoid the other note holders in the state court action was, however, quickly frustrated by Spade's efforts to bring all of the note holders into the action. Early in the proceedings, Spade filed a motion with the state court seeking to join, as indispensable parties, the other sixteen parties that held CSI's 1997 notes. In addition, Spade filed his own lawsuit, naming ProFutures and the other sixteen note holders as defendants, seeking a determination that certain transfers of property to his wife were not fraudulently made. See Exhibit 15a. Shortly after Spade filed his action against the entire group of note holders and before the state court could consider Spade's motion to join the other note holders, ProFutures, along with two other 1997 note holders, filed the involuntary petition against Spade. ProFutures' representative testified that the primary purpose of filing this petition was to gain the assistance of a trustee who, using the special tools given to trustees by the Bankruptcy Code, could conduct discovery into Spade's affairs far more effectively and quickly than ProFutures could in its state court action.

ProFutures' claim that it filed this petition to improve the recovery for all creditors is inconsistent with its previous litigation strategy which sought to exclude other note holders from its state court collection action. If a fair recovery for all creditors was ProFutures' primary objec-

tive, it most certainly could have filed the involuntary petition to begin with rather than its exclusive state court collection action. It was not until Spade began maneuvering to bring the other note holders into the state court action that ProFutures elected to file this petition. Furthermore, it is evident that ProFutures knew that conducting discovery against Spade in the state court was going to be a difficult and expensive endeavor. ProFutures' representative admitted that it filed the petition so that a trustee could come in and perform the costly discovery into Spade's affairs that ProFutures would otherwise be required to perform if the case were to proceed in the state court. Based upon the circumstances described above as well as the testimony of ProFutures' representative, the Court finds that the filing of this petition to be a litigation tactic by ProFutures. ProFutures filed this petition to control the forum in which the dispute would be heard and to gain a litigation advantage over Spade by enlisting a trustee to conduct and pay for discovery into Spade's affairs. The Petitioning Creditors did not file the petition in order to commence an orderly and fair distribution of Spade's assets to all of Spade's creditors. In view of the apparent self interest of ProFutures in filing this petition, the Court must seriously consider whether the creditors as a whole will be better served by the exercising jurisdiction over this case or by dismissal in favor of allowing the state court to continue with the cases pending before it. *See First Financial Enterprises,* 99 B.R. at 755; *In re Business Information Co.,* 81 B.R. at 385.

## B. Availability of Another Forum

In determining § 305 motions, Courts have frequently considered whether another forum is available to protect the interests of the parties or whether there is already a pending proceeding in state court. *See In re Fax Station, Inc.,* 118 B.R. at 177; *In re Jr. Food Mart of Arkansas, Inc.,* 241 B.R. at 426; *In re 801*

*South Wells Street L.P.,* 192 B.R. at 723–724; *In re Silver Spring Center,* 177 B.R. 759 (Bankr.D.R.I.1995); *In re Tarletz,* 27 B.R. at 793; *In re Argus,* 206 B.R. at 755. There is no question that another forum is available as the two lawsuits that precipitated this involuntary petition are presently pending in the El Paso County District Court in Colorado Springs, Colorado. The question is whether the state court forum is adequate to resolve the dispute between the Petitioning Creditors and the alleged Debtor and whether allowing the case to proceed in the state court better serves the interests of the creditors and the debtor.

The Petitioning Creditors argue that dismissing the case under § 305 would be detrimental to creditors because the bankruptcy court provides procedural and substantive benefits that are unavailable to creditors in state court. The Petitioning Creditors assert that creditors would be better off in a bankruptcy proceeding because a trustee could recover, for the benefit of all creditors, certain preference payments Spade may have made prior to the petition as well as fraudulent transfers Spade allegedly made to his wife. Furthermore, the Petitioning Creditors suggest that creditors will be better off in a bankruptcy proceeding because they will be entitled to the appointment of a Chapter 7 trustee, or an "independent fiduciary" as they have characterized, to investigate Spade's financial affairs. Spade asserts, however, that these suggested benefits of a bankruptcy case are illusory in this case. Spade also contends that creditors will not be better off as a bankruptcy case will disproportionately benefit ProFutures, the single largest note holder in the creditor class. Spade claims that the state court offers a more appropriate forum to resolve the pending litigation and that creditors, as a whole, will be better off by dismissal of this case.

The Petitioning Creditors correctly point out that a bankruptcy trustee may

recover preferences made to non-insiders pursuant to 11 U.S.C. § 547, however this suggested advantage over the pending state court proceeding is overblown in this case. The "preferences" alluded to by the Petitioning Creditors are payments totaling less than $4,000 made by Mr. Spade in the ninety days proceeding the bankruptcy petition. According to Spade, these payments were made toward his Key Bank loan, the loan from Robert Nash, and possibly toward services provided by his lawyers at Holland and Hart. Assuming that the trustee elects to incur the cost of prosecuting an adversary proceeding to recover these preferences, and assuming that the trustee overcomes a plausible "ordinary course" defense by the transferees, these recovered preferences, if any, will do very little to satisfy the nearly $3 million the Petitioning Creditors seek to recover. Moreover, the trustee's administrative costs of prosecuting this preference action would likely consume most, if not all of the funds recovered. Thus, there is little chance that creditors will benefit in any way from a trustee's ability to recover Spade's alleged preferences under § 547. Additionally, the bankruptcy court would offer no special advantage to creditors with respect to litigating the fraudulent transfer issues. According to the record, Spade's alleged fraudulent transfers took place in 1996, well outside of the one year statute of limitations of 11 U.S.C. § 548, a special provision in the Bankruptcy Code that provides trustees a separate avenue to recover fraudulent transfers. Due to the date of the transfers, a chapter 7 trustee would only be able to pursue the recovery of these transfers through 11 U.S.C. § 544, a provision which gives trustees the authority to avoid transfers under existing state law theories. In other words, any fraudulent conveyance action in the bankruptcy court would apply the same state law that would be applied in the pending state court action.

In addition, there is little merit the Petitioning Creditors' contention that the appointment of an "independent fiduciary," or trustee, to investigate the affairs of the Debtor would be more advantageous to creditors. The Petitioning Creditors cite numerous cases in which courts have noted the general benefits that a trustee can provide creditors, however they have not identified the unique services a trustee would bring to the creditors in this case *vis-a-vis* the procedural tools and remedies available to creditors in the state court proceedings. ProFutures' representative did, however, explain that ProFutures would benefit from a trustee being appointed in this case as it would be relieved of the difficulty of obtaining information from Mr. Spade through the laborious and costly discovery proceedings in state court. At trial, ProFutures' representative bemoaned the difficulty in extracting information from Spade, and his testimony reflects that ProFutures views this involuntary bankruptcy proceeding as a more convenient and expedient way to obtain information about Spade's assets and financial dealings than the proceeding it initially commenced in the state court. In this case, the bankruptcy court does not provide creditors, as a whole, any special procedural or substantive advantages over the state court forum.

This case is little more than a two-party collections dispute between ProFutures and Mr. Spade. While it is true that ProFutures has enlisted three other note holders to join in its petition, this was done to satisfy the technical requirements required to file an involuntary petition under 11 U.S.C. § 303. The record reflects that prior to the filing of the petition, *none* of the 1997 note holders had sought to collect on Spade's guaranty on their notes. *See Transcript of Trial*, June 15, 2000, 169:14–23. Even if these note holders had been aggressively demanding payment from Spade and had joined ProFutures case in the state court, their claims would be identical in all respects—based upon the same set of facts and involving the same legal issues. Regardless of whether one or all of the note holders were demanding pay-

ment from Spade, this case would still be in the nature of a two-party dispute—the note holders versus Spade. There is no need for a federal court to resolve this two-party dispute that implicates purely state law issues. *See In re Mazzocone,* 183 B.R. 402, 421 (Bankr.E.D.Pa.1995) ("because a bankruptcy forum is often not the proper forum in which to adjudicate non-bankruptcy issues, litigation of such issues is frequently best left to the state courts and should not be imposed upon this specialty court unless necessary to resolve a bankruptcy-centered dispute."); *see also In re Axl,* 127 B.R. at 484 ("Generally, a [bankruptcy] court should not take jurisdiction over a two-party dispute, unless special circumstances exist.").

Furthermore, moving this case into the bankruptcy court will likely fail to provide the litigation panacea contemplated by the Petitioning Creditors. After all, should this court enter the order for relief under Chapter 7 as desired by the Petitioning Creditors, Spade may very well exercise his right under 11 U.S.C. § 706 to convert the case to a proceeding under Chapter 11. If so, Spade would displace the Petitioning Creditors' independent Chapter 7 trustee and assume the duties of the trustee himself as the debtor in possession. *See* 11 U.S.C. § 1107(a). If this occurred, it is unlikely that Spade would pursue the preference or fraudulent conveyance actions the Petitioning Creditors believe exist or dole out the information the Petitioning Creditors hope a trustee would provide to about Spade's affairs. In addition to losing the benefits of a Chapter 7 trustee, Spade's possible conversion would entangle the creditors in a lengthy plan confirmation process. In *Tarletz,* Judge Clark described the delays that are typically encountered in proceedings under Chapter 11:

> Under Chapter 11, a debtor has the exclusive right for 120 days to file a plan. This time period can be extended for cause under 11 U.S.C. § 1121(d). Assuming that a 60 day extension were granted, it would be six months before a plan and disclosure statement were filed. It would be 30 to 60 days thereafter before a hearing were held on the disclosure statement and approval obtained. The plan and disclosure statement would then have to be submitted to creditors. However, a hearing on confirmation might not be held for two or three months thereafter.

*In re Tarletz,* 27 B.R. at 794. Although Spade has not indicated whether or not he would convert to Chapter 11 should an order for relief enter, the possibility of conversion and its effects on creditors as a whole must be considered when evaluating whether dismissal would better serve the interests of creditors. In this case, there is a very real possibility that Spade would convert this case to Chapter 11. Such a conversion would deprive the Petitioning Creditors of nearly all the benefits they believe would exist in the bankruptcy court and cause serious delay to all creditors. On the other hand, allowing this case to proceed in the state court would not expose creditors to the risk of delay possible in a chapter 11 proceeding. The state court litigation is in its preliminary stages and all necessary parties can easily be joined. The lack of procedural or substantive benefits in the bankruptcy court, the fact that the parties can fairly resolve this dispute in the state court, and the fact that the proceedings in the bankruptcy court may cause undue delay to creditors suggests that the interests of the creditors and the Debtor would be better served by dismissal of the case in favor of the state court proceedings.

### C. Economy and Efficiency of Administration

The economy and efficiency of administering the case in the bankruptcy court is another factor courts have routinely evaluated in considering abstention under § 305. *See In re Fax Station, Inc.,* 118 B.R. at 177; *In re Realty Trust Corp.,* 143 B.R. at 926; *In re Fitzgerald Group,* 38 B.R. at 18 ("In evaluating the interests of

the creditors and the debtor, primary consideration should be given to the efficiency and economy of administration.").

The Petitioning Creditors argue that it would be more efficient to recover Spade's alleged preferences and fraudulent transfers and resolve the likely disputes among Spade's creditors in the bankruptcy court as opposed to the state court. The Court disagrees. Bringing this case into the bankruptcy court would only add an additional layer of expense to the resolution of this two-party case. Assuming the case remains in Chapter 7, the estate will be required to pay the fees and costs of any specialized bankruptcy counsel hired by the trustee as well as the trustee's compensation for the administration of the estate. Additionally, the bankruptcy court will be required to carry out all of the administrative obligations that are inherent in Chapter 7 liquidation proceedings. Given the Court's previous findings that the state court affords creditors a suitable forum to resolve this dispute, it would be inefficient and excessively costly to process this debt collection case through this Court. Furthermore, the Petitioning Creditors' expectations are premised upon the belief that Spade would remain in Chapter 7 rather than convert to Chapter 11. There is no guaranty that Spade would remain in Chapter 7, however. As discussed above in Part II(B), such a conversion would promptly eliminate any efficiencies gained under Chapter 7 as forecasted by the Petitioning Creditors. Conversion would also diminish the assets available to creditors as Spade would be required to employ bankruptcy counsel and incur the fees which he would be obligated to pay to the United States Trustee. Whether in Chapter 7 or 11, resolving this collection dispute in the bankruptcy court will be both inefficient and uneconomical to creditors *as a whole*. The Court concludes that state court is the most efficient and economical forum to administer the isolated collection issues raised in this dispute, thus this factor suggests that the interests of creditors and the alleged Debtor would be better served by dismissal.

## D. Prejudice to the Parties

The prejudice to the parties is also an important factor to consider under § 305. *See In re Realty Trust Corp.*, 143 B.R. at 926; *In re Carl Mazzocone*, 200 B.R. at 575. Looking first to the creditors, the Petitioning Creditors claim that creditors will be prejudiced if the Court dismisses this case because creditors will be deprived of the procedural and substantive tools that are available only in the bankruptcy process and will require creditors to engage in piecemeal litigation in the state court.

As discussed in Part II(B), the Court is not persuaded that the creditors in this case will be prejudiced by litigating these issues in the state court. In fact, the Court believes that creditors, as whole, will be prejudiced if this Court *accepts* jurisdiction in this case. It must first be noted that the Petitioning Creditors do not represent the interests of *all* creditors in this case. Again, ProFutures is the leading force behind this petition and has persuaded three other note holders to join in the petition to satisfy the requirements of § 303. There are, however, other note holders and creditors in this case that did not join the petition and their interests must also be fairly considered when determining whether the interests of creditors would be better served by dismissal.

First, there are three creditors that are not CSI note holders: Key Bank, Robert Nash, and Holland and Hart, the law firm representing Spade in these proceedings and in the state court. At trial, Spade testified that he was current with each of these creditors and making regular payments toward these obligations. Should an order for relief enter, these three creditors will most certainly be prejudiced. The regular payments these creditors are presently receiving would likely be halted and these creditors will be forced to partic-

ipate in the bankruptcy case.[5] These creditors may be required to incur the expense of defending against a possible preference actions by the trustee as well as any objections to their claims to payment. Should the Court dismiss this case, however, these creditors would likely continue to receive regular payments and be able to avoid participation in the state court litigation.[6] Thus, dismissal of the petition would better serve the interests of these creditors.

The Court believes that the interests of the CSI note holders that did not join the involuntary petition would be better served by dismissal as well. There is nothing in the record to suggest that the non-joining note holders have any desire to collect from Spade in either the bankruptcy court or in the state court. As of the date of the trial in this matter, none of the non-joining creditors had appeared in the state court actions or this court. The evidence indicates that none of these other note holders had ever made a demand on Spade to fulfill his guaranty. Because they have not sought to collect from Spade, these creditors have not been required to contribute toward the costs of ProFutures collection in the state court. Should the Court exercise jurisdiction over this case, however, these creditors will be forced to participate in the bankruptcy process or forfeit their claims. Furthermore, these creditors will end up subsidizing the costs of what is really ProFutures' collection action. Whether intentional or not, ProFutures' effort to bring its case into the bankruptcy court will shift the obligation of funding the discovery and litigation against Spade from ProFutures to *all* of Spade's creditors. In the state court action, ProFutures was incurring the costs of collecting against Spade. In the bankruptcy court, all of Spade's creditors will be forced to pay the administrative costs of a trustee, his or her counsel, and any litigation commenced in the bankruptcy court. In view of these considerations, the Court concludes that the non-joining note holders would be prejudiced by the entry of an order for relief.

As to the alleged Debtor, there is no question that a forced bankruptcy would be prejudicial to his interests. First, Spade has expressed his interest to avoid a bankruptcy proceeding, thus the exercise of bankruptcy jurisdiction over this case would be prejudicial to this interest. Second, it is important to distinguish that this petition was filed against Mr. Spade in his individual capacity. Should this case proceed in Chapter 7 and should Spade receive a discharge, Spade would be stripped of his eligibility for relief under Chapter 7 for a period of six years. *See* 11 U.S.C. § 727(a)(8). Third, Spade has a legitimate interest in avoiding the stigma that attaches to those forced into bankruptcy. *See, e.g., In re Elsa Designs, Ltd.,* 155 B.R. 859, 863 (Bankr.S.D.N.Y.1993) ("the bankruptcy Code should not be used as a 'club against debtors ... who would rather pay up than suffer the stigma of involuntary proceedings'") (quoting 130 Cong.Rec. S7618 (daily ed. June 19, 1984) (statement of Sen. Baucus)). The Supreme Court and the Tenth Circuit have acknowledged that debtors are stigmatized by bankruptcy proceedings. *See, e.g., Perry v. Commerce Loan Co.,* 383 U.S. 392, 395, 86 S.Ct. 852, 854, 15 L.Ed.2d 827 (1966); *R. Eric Peterson Constr. Co. v. Quintek, Inc. (In re R. Eric Peterson Constr. Co.),* 951 F.2d 1175,

**5.** Holland and Hart would be seriously impacted if Spade were to convert this case to Chapter 11. Specifically, Holland and Hart would be ineligible to represent Spade as debtor-in-possession as the firm would be unable to satisfy the disinterestedness requirement of 11 U.S.C. § 327(a). As noted above, the firm has a claim against Spade for the pre-petition legal services provided to Spade in the state court proceedings. Consequently, Holland and Hart would be forced to choose between dropping its claim to continue its representation of Spade, or dropping Spade as a client to recover on its claim. Thus Holland and Hart would clearly be prejudiced if an order for relief entered and Spade converted the case to Chapter 11.

**6.** These three creditors have not been named in either of the state court actions.

1180 (10th Cir.1991). The Court concludes that it would be prejudicial to Spade to be subjected to this stigma when there is an alternative forum to resolve the issues raised in this case. These considerations indicate that dismissal of the case would better serve the interests of the creditors and the alleged Debtor.

### III. Conclusion

After considering the motivation of the parties, the availability of another forum, the economy and efficiency of administration, and the prejudice to the parties, the Court finds that the interests of the creditors and the alleged Debtor will be better served by dismissing this case pursuant to 11 U.S.C. § 305. Accordingly, it is

ORDERED that the involuntary petition in bankruptcy filed by ProFutures Special Equities Fund LP, Gary Schlessman, Lee E. Schlessman, and Cal J. Rickel and Amanda Rickel against Robert A. Spade is hereby DISMISSED.